No. 23-1460

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MARCOS MENDEZ,

*Defendant-Appellant.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

NO. 16 CR 163

THE HONORABLE MARY M. ROWLAND PRESIDING

_____

## BRIEF OF THE DEFENDANT-APPELANT MARCOS MENDEZ

_____

Robert Robertson
Marko Duric
ROBERTSON DURIC
One North LaSalle, Suite 300
Chicago, Illinois 60602
(312) 223-8600
*Attorneys for Defendant-Appellant*

**ORAL ARGUMENT REQUESTED**

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No.:  23-1460

Short Caption:  United States of America v. Mendez

[   ]PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR
    REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED

(1)  The full name of every party that the attorney represents in the case (if the party
     is a corporation, you must provide the corporate disclosure information required
     by Fed. R. App. P 26.1 by completing item #3):

     Marcos Mendez

(2)  The names of all law firms whose partners or associates have appeared for the
     party in the case (including proceedings in the district court or before an admin-
     istrative agency) or are expected to appear for the party in this court:

     Robertson Duric

(3)  If the party or amicus is a corporation:

     i)  Identify all its parent corporations, if any; and

         N/A

     ii) list any publicly held company that owns 10% or more of the party's or
         amicus' stock:

         N/A

_____

Attorney's Signature:  ____s/ Marko Duric____     Date:  05/20/2023

Attorney's Printed Name:  Marko Duric

Please indicate if you are Counsel of Record for the above listed parties pursuant to
Circuit Rule 3(d):  Yes

Address:  One North LaSalle, Suite 300 Chicago, Illinois 60602

Phone Number:  (312) 223-8600 Fax Number:  (312) 372-7840

E-Mail Address:  marko@robertsonduric.com

i

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No.:  23-1460

Short Caption:  United States of America v. Mendez

[   ]PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR
     REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED

(1) The full name of every party that the attorney represents in the case (if the party
    is a corporation, you must provide the corporate disclosure information required
    by Fed. R. App. P 26.1 by completing item #3):

    Marcos Mendez

(2) The names of all law firms whose partners or associates have appeared for the
    party in the case (including proceedings in the district court or before an admin-
    istrative agency) or are expected to appear for the party in this court:

    Robertson Duric

(3) If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

        N/A

    ii) list any publicly held company that owns 10% or more of the party's or
        amicus' stock:

        N/A

---

Attorney's Signature:    s/ Robert Robertson                    Date:  05/20/2023

Attorney's Printed Name:  Robert Robertson

Please indicate if you are Counsel of Record for the above listed parties pursuant to
Circuit Rule 3(d):  Yes

Address:  One North LaSalle, Suite 300 Chicago, Illinois 60602

Phone Number:  (312) 223-8600 Fax Number:  (312) 372-7840

E-Mail Address:  robrobertson1@sbcglobal.net

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT......................................................................1

ISSUES PRESENTED FOR REVIEW.............................................................2

STATEMENT OF THE CASE..........................................................................3

SUMMARY OF ARGUMENT...........................................................................13

STANDARD OF REVIEW................................................................................15

ARGUMENT.....................................................................................................16

I.     The Court Should Decline To Follow *Wanjiku* And *Skaggs*, Because The Good-Faith Exception Does Not Apply To The Unsettled Question Of Whether The Government Can Search A Citizen's Cell Phone At The Border...................16

II.    The Court Should Apply The Reasoning Of *Riley* And *Carpenter* And Reverse The Denial Of The Motion To Suppress Because The Fourth Amendment Requires Probable Cause And A Warrant To Search A Citizen's Cell Phone........................................................................................................26

    A.    The Supreme Court's Border Search Precedents Do Not Support The Warrantless Search Of A Citizen's Cell Phone...............................28

    B.    A Warrantless Search Of A Citizen's Cell Phone At The Border Is An Unreasonable Invasion Of Privacy...............................................33

    C.    The Government's Interests And Claims Of Efficiency Do Not Justify The Warrantless Search Of A Cell Phone At The Border...................36

III.   Even Were The Court Not To Apply The Fourth Amendment Warrant Requirement, The Court Should Reverse Based On The Absence Of Reasonable Suspicion Supporting This Search.....................................................................39

    A.    The Privacy Interest In A Cell Phone Requires, At The Very Least, The Government To Have Reasonable Suspicion That It Contains Digital Contraband.............................................................................40

    B.    There Was No Reasonable Suspicion For This Search.......................42

CONCLUSION.................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Gant*, 556 U.S. 332 (2009)........................................................17, 27, 41

*Boyd v. United States*, 116 U.S. 616 (1886)..................................................28-29

*Carpenter v. United States*, 138 S. Ct. 2206 (2018)......................16, 27-28, 32, 36, 39

*Carrol v. United States*, 267 U.S. 132 (1925)..................................................36

*Coolidge v. New Hampshire,* 403 U.S. 443 (1971)............................................38

*Davis v. United States*, 564 U.S. 229 (2011)..................................13, 16, 17, 22, 25

*Huff v. Reichert*, 744 F.3d 999 (7th Cir. 2014)..................................................42

*Kaniff v. United States*, 351 F.3d 780 (7th Cir. 2003)................................23, 41-42

*Katz v. United States*, 389 U.S. 347, 351 (1967)............................................28, 39

*Kyllo v. United States*, 533 U.S. 27 (2001)........................................................27

*Ornelas v. United States,* 517 U.S. 690 (1996)....................................................15

*Reid v. Georgia*, 448 U.S. 438 (1980)..........................................................42, 44

*Riley v. California*, 573 U.S. 373 (2014)........................13, 16, 19, 26-28, 31-39, 41

*Swenie v. Village of Maywood*, No. 17-CV-1010, 2018 WL 4635645 (N.D. Ill. Sept. 27, 2018)................................................................................................43

*Terry v. Ohio,* 392 U.S. 1 (1968)................................................................42, 44

*Vernonia School Dist. 47J v. Action*, 515 U.S. 646 (1995)....................................36

*United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019)..........................36, 38, 41

*United States v. Banks*, 60 F. 4th 386 (7th Cir. 2023)..........................................18

*United States v. Basinski*, 226 F.3d 829 (7th Cir. 2000)................................27, 33

*United States v. Berrios*, 990 F.3d 528 (7th Cir. 2021)..........................18-21, 23-24

*United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019)..........................................41

*United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013)..................................24

*United States v. Diggs*, 385 F. Supp. 3d 648 (N.D. Ill. 2019)..........................20, 24

*United States v. Etchin*, 614 F.3d 726 (7th Cir. 2010)........................................15

*United States v. Flores-Lopez*, 670 F.3d 803 (7th Cir. 2012)................................19

*United States v. Flores-Montano*, 541 U.S. 149 (2004)............................21, 23, 31

*United States v. Garcia*, 68 F. Supp. 3d 1113 (N.D. Cal. 2014)..............................24

*United States v. Gary*, 790 F.3d 704 (7th Cir. 2015)..........................................20

*United States v. Jenkins*, 850 F.3d 912 (7th Cir. 2017)..............................18, 19, 21

*United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997).......................................42, 44

*United States v. Johnson*, 457 U.S. 537 (1982)...............................................17, 25

*United States v. Johnson*, 991 F.2d 1287 (7th Cir. 1993)...............................23, 41

*United States v. Jones*, 565 U.S. 400 (2012)........................................................28

*United States v. Kamaldoss*, No. 19-CR-543 (ARR), 2022 WL 1200776 (E.D.N.Y. Apr. 22, 2022)................................................................................................................25

*United States v. Kim*, 103 F. Supp. 3d 32 (D.D.C. 2015)................................32, 44

*United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018).........................................36

*United States v. Leon*, 468 U.S. 897 (1984).........................................................17

*United States v. Lickers*, 928 F.3d 609 (7th Cir. 2019)........................................38

*United States v. Martin*, 712 F.3d 1080 (7th Cir. 2013)......................................18

*United States v. Marrocco*, 578 F.3d 627 (7th Cir. 2009)....................................42

*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976)..................................40, 44

*United States v. Montoya de Hernandez*, 473 U.S. 531 (1985)....................21, 23, 27, 30-31, 36, 41-42

*United States v. Ramsey*, 431 U.S. 606 (1977)............................................29-30, 36

*United States v. Sigmond–Ballesteros*, 285 F.3d 1117 (9th Cir. 2002)....................43

*United States v. Skaggs*, 25 F.4th 494 (7th Cir. 2022)..........................................13

*United States v. Smith*, No. 22-CR-352 (JSR), 2023 WL 3358357 (S.D.N.Y. May 11, 2023)................................................................................................................35, 37

*United States v. Stokes*, 726 F.3d 880 (7th Cir. 2013).........................................15

*United States v. Taylor*, 776 F.3d 513 (7th Cir. 2015).........................................21

*United States v. Touset*, 890 F.3d 1227 (11th Cir. 2018)................................40-41

*United States v. Vergara*, 884 F.3d 1309 (11th Cir. 2018)......................31-32, 35, 37

*United States v. Villamonte-Marquez*, 462 U.S. 579 (1983)................................31

*United States v. Walden*, 146 F.3d 487 (7th Cir. 1998)...................................43, 44

*United States v. Waletzki*, 124 F.3d 206 (7th Cir. 1997)......................................15

*United States v. Wanjiku*, 919 F.3d 472 (7th Cir. 2019)..................13, 16, 21-22, 32

*United States v. Whitaker*, 820 F.3d 849 (2016)..................................................18

*United States v. Wilbourn*, 799 F.3d 900 (7th Cir. 2015)................................15, 20

*United States v. Williams*, 731 F.3d 678 (7th Cir. 2013)..................................43-45

*United States v. Yang*, 286 F.3d 940 (7th Cir. 2002)……………………………………..23

## Statutes

The Collection Act of 1789, 1 Cong. Ch. 5, July 31, 1789, 1 Stat. 29, § 24……………..29

## Other Authorities

*Note, The Border Search Muddle*, 132 Harv. L. Rev. 2278, 2293 (2019)………………29

Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 MICH L. REV. 547 (1999)……………………………………………………………………………………29

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231, which grants the district court jurisdiction of all offenses against the laws of the United States**.** Defendant-Appellant was charged with two counts of producing child pornography in violation of 18 U.S.C. section 2251(a); one count of transporting child pornography in violation of 18 U.S.C. section 2252A(a)(1), and one count of possessing child pornography in violation of 18 U.S.C. section 2252(a)(5)(B). [Dkt. 6]. On July 6, 2020, Defendant-Appellant filed a Motion To Suppress. [Dkt. 50]. The district court denied that motion in a written opinion on July 28, 2021. [Dkt. 74]. On March 9, 2022, Defendant-Appellant entered a plea of guilty to a single count of producing child pornography (Count II), with all remaining counts dismissed on the motion of the Government. [Dkt. 91; Dkt. 135 at 3]. That plea agreement contained a specific provision that permitted Defendant-Appellant to appeal the district court's denial of his Motion To Suppress. [Dkt. 91]. On March 8, 2023, Defendant-Appellant was sentenced to 300 Months' imprisonment by the district court. [Dkt. 130]. The district court subsequently ordered that Defendant-Appellant pay a $100.00 assessment, a $5,000.00 JTVA Assessment, and $31,629.00 in restitution. [Dkt. 135 at 10]. Defendant-Appellant filed a timely notice of appeal on March 10, 2023. [Dkt. 133]. This appeal follows the final disposition of all criminal charges against Defendant-Appellant. This Court possesses jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the good-faith exception to the exclusionary rule recognized in *Davis v. United States*, 564 U.S. 229 (2011), can excuse this search in the absence of binding precedent specifically authorizing it.

2.    Whether the district court erred in denying Defendant-Appellant's Motion To Suppress by: (a) declining to apply the Fourth Amendment's warrant requirement to the search of his cell phone; and alternatively, (b) finding that reasonable suspicion supported the search.

## STATEMENT OF THE CASE

Customs and Border Protection ("CBP") officers stopped and searched Marcos Mendez on February 20, 2016, while Mendez was passing through O'Hare Airport on his way home from Ecuador by way of Panama City. [Dkt. 74 at 2]. On that date, CPB Agent Callison was employed by CBP for about 2 and a half years and was working as part of the Passenger Enforcement Rover Team. [Dkt. 85 at 12:13-22]. That is a counterterrorism roving team. [Dkt. 85 at 83:15-18]. Callison had training in child exploitation, which was about an hour long and occurred once a year. [Dkt. 85 at 53:17-54:10].

Callison received a "lookout" from the intelligence unit to talk to Marcos Mendez about his travel. [Dkt. 85 at 14:19-25]. Callison said that this exam: 1.) was for law enforcement purposes, and 2.) that information obtained would be used in criminal prosecution. [Dkt. 85 at 36:17-37:20]. The lookout is a way to direct the CBP agent's attention to something that might need to be looked into further. [Dkt. 85 at 15:1-6]. These lookouts are a daily occurrence. [Dkt. 85 at 15:19-21].

The decision to search Mendez was made before Mendez even got off his flight. [Dkt. 85 at 37:24-38:2]. A supervisor was involved in the decision to search Mendez. [Dkt. 85 at 38:3-4]. Prior to the search, they had no information that Mendez was actively involved in committing a crime. [Dkt. 85 at 42:1-43:8]. They had no information that Mendez was involved in child trafficking, or that he was involved in smuggling contraband or child pornography. [*Id.*] They had no evidence from social media, texts, or email concerning Mendez. [*Id.*] They had no physical evidence against

3

Mendez either. [*Id.*]  Subsequently, nothing unusual was found in his luggage. [*Id.*]

At the hearing on the Motion to Suppress, Agent Callison testified as follows:

Q.   At the time that you searched Mr. Mendez's cell phone, or just prior to that point, you had no information that he was actively involved in committing a crime, correct?

A.   Correct.

Q.   You had no information that he was actively involved in child trafficking.

A.   Correct.

Q.   Had no information he was actively involved in smuggling contraband.

A.   Correct.

Q.   Including child pornography.

A.   Correct.

Q.   At the time of the search of his cell phone, what you've described as a manual search, you also had no social media evidence regarding Mr. Mendez.

A.   Can you say that again.

Q.   At the time you conducted what you've described as a manual search of Mr. Mendez's cell phone, you had no social media evidence.

A.   Correct. We don't look at any social media.

Q.   You had no e-mail evidence.

A.   No.

Q.   No text message evidence.

A.   No.

Q.   You had no physical evidence.

A.   No.

Q.   You found nothing unusual in his luggage.

A.   I did not look at his luggage.

Q.   Okay. During the course of this entire examination, none of the officers involved found anything unusual in his luggage?

A.   Not that I'm aware of.

Q.     No condoms?

A.     I have no idea.

[Dkt. 85 at 42:1-43:8].

According to Callison, the lookout for Mendez was based on a prior criminal record relating to child pornography or endangering a minor, and previous travel. [Dkt. 85 at 15:22-16:11]. Callison was aware that Mendez had a misdemeanor conviction from 2011 for endangering the life or health of a child. [*Id.*] Callison knew that Mendez was given probation on that case and that probation had expired before the date of the search. [Dkt. 85 at 40:8-17]. While Callison could not recall the exact details of Mr. Mendez's criminal record at the suppression hearing, he testified that he would have reviewed Mr. Mendez's criminal history, which the parties entered as Exhibit 6. [Dkt. 85 at 40:4-7; 80:22-81:19]. Exhibit 6 shows a prior arrest on charges of child pornography and indecent solicitation, resulting in a 2011 conviction for endangering the life of a child. [Dkt. 142].

As for Mendez's previous travel, Callison was aware of a work trip to Mexico two years prior in 2014 during which Mendez reported that he was kidnapped, all his electronics were taken, and he was told by someone (possibly his employers) to come home safely. [Dkt. 85 at 17:6-13; 40:18-41:7; 55:24-56:10]. Mendez said at the time that he was in danger and Callison agreed that it was certainly a reasonable response to leave Mexico if he was in danger. [Dkt. 85 at 56:1-10]. Agent Callison agreed that travel from Mexico or Canada is not unusual for a United States citizen. [Dkt. 85 at 55:7-9].

At the time of the search in 2016, Callison was aware that Mendez was traveling from Ecuador, where Mendez was visiting his fiancée. [Dkt. 85 at 55:13-17]. Callison was occasionally briefed on countries where child exploitation was more prevalent [Dkt. 85 at 54:18-23], and said that Ecuador was a potential "source country" for child trafficking, [Dkt. 85 at 16:17-21; 17:23-18:5]. When asked whether he was investigating Mendez for child trafficking, Callison replied "it's a possibility." [Dkt. 85 at 41:16-18]. Callison agreed, however, that pretty much any country could be a source country for child pornography, and that calling Ecuador a source country was like calling it a high-crime area. [Dkt. 85 at 41:19-25].

CBP officers interviewed Mendez and searched Mendez's phone for approximately 30 minutes. [Dkt. 74, p. 2]. Callison said it took approximately 45 minutes to an hour from his first interaction with Mendez to when finished looking through Mendez's phone. [Dkt. 85 at 27:12-17]. Callison asked Mendez to confirm that the items he was carrying belonged to him, which Callison said was for purposes of "[p]rosecution." [Dkt. 85 at 37:3-12]. Callison described Mendez as condescending and deflecting attention from the inspection in that Mendez believed he should be let go as a United States citizen: "He was above being inspected. He was a U.S. citizen. We should just be letting him go." [Dkt. 85 at 21:15-16].

Callison said that it was not unusual for travelers to become agitated. [Dkt. 85 at 43:9-20; 58:24-59:2]. It was around or past midnight. [Dkt. 85 at 43:14-15]. Mendez was on his way home from an international trip and was in secondary inspection

for three hours. [Dkt. 85 at 43:16-20]. During those whole three hours, Mendez never contradicted himself or changed his story. [Dkt. 85 at 43:21-24].

According to Callison, there was pornography in Mendez's Photo Gallery that included child erotica or child pornography. [Dkt. 85 at 24:20-25:3]. The child erotica is not illicit. [Dkt. 85 at 49:9-11]. Callison has conducted hundreds or thousands of searches between the Mendez search and when he testified at the hearing. [Dkt. 85 at 46:17-19]. Callison never made notes about the photos he saw, Mendez's demeanor, or his conversation with Mendez. [Dkt. 85 at 46:20-48:3]. The entire report or closeout regarding that day was only a paragraph long and was prepared by another agent. [Dkt. 85 at 47:9-19].

Callison subsequently reviewed the files in the iSafe application on Mendez's phone. [Dkt. 85 at 25:8-25]. iSafe is a series of applications on an iPhone that are meant to keep data secure. [Dkt. 85 at 32:8-14]. Callison does not have any expertise in how iSafe works and has no foundation to speak as to whether iSafe relies on cloud storage. [Dkt. 85 at 48:25-49:4]. In the iSafe application there were additional photos and videos that Callison considered child pornography. [Dkt. 85 at 25:19-25]. The paragraph-long report from that day did not distinguish between photos that Callison claimed he viewed manually from the photo gallery and those he viewed in iSafe. [Dkt. 85 at 48:1-3].

As he was searching Mendez's phone, Callison had control over the phone and could have placed it into airplane mode so it could not manipulated. [Dkt. 85 at 50:6-11]. Callison could have contacted Homeland Security prior to using DOMEX

7

(Document and Media Exploitation) Equipment. [Dkt. 85 at 50:18-25]. Callison admitted that he could have sought a warrant at that point to search the phone. [Dkt. 85 at 51:1-12].  Callison further admitted that there were no exigent circumstances preventing a warrant from being obtained. [Dkt. 85 at 51:14-16].

Instead of obtaining a warrant, however, Callison conducted a search of the phone using DOMEX, which required the approval of a supervisor. [Dkt. 74, p. 2; Dkt. 85 at 30:5-9; 51:14-22; 52:15-53-2]. The sole purpose of using DOMEX was to extract and preserve files for use in a prosecution. [Dkt. 85 at 51:23-52:3]. This DOMEX search took two to three hours. [Dkt. 85 at 52:4-6]. DOMEX extracted files that numbered in the thousands from Mendez's phone. [Dkt. 85 at 56:11-25]. Among the information extracted, the DOMEX equipment extracted certain photographs from Mendez's cell phone's camera roll. [Dkt. 85 at 30:18-23]. It could not access files in "iSafe." [Dkt. 85 at 32:8-14].

The CBP officers allowed Mendez to clear customs, but retained his phone. [Dkt. 85 at 34:18-21]. The CBP saved the data extracted from Mendez's phone to CDs, which were turned over to Cook County Sheriff's Police Investigator Anthony Stack. [Dkt. 85 at 33:9-11]. Agent Jennifer Finnerty became involved in the investigation a couple days after Mendez's phone was searched. [Dkt. 85 at 65:22-66:5].  Her role was to build a criminal case against Mendez. [Dkt. 85 at 67:1-6].

On February 29, 2016, Sheriff's Police Investigator Stack reviewed images extracted from Defendant's cell phone with DOMEX. [Dkt. 50, p. 2]. Based on his warrantless review of the images extracted with DOMEX, Sheriff's Police Investigator

Stack searched through Defendant's Facebook page and Facebook friends on March 7, 2016. [Dkt. 50, p. 2].  Sheriff's Police Investigator Stack found an adult woman resembling an adult woman depicted in one of the images extracted from Defendant's iPhone ("Individual A"). [Dkt. 50, p. 2]. Sheriff's Police Investigator Stack also found that some of the non-illicit photos from Defendant's iPhone were posted on Individual A's Facebook page. [Dkt. 50, p. 2-3].  In addition, Sherriff's Police Investigator Stack found that Individual A posted photos of her granddaughter depicting a pink blanket Stack believed was the same pink blanket depicted in photos recovered from Defendant's phone. [Dkt. 50, p. 3].

On March 9, 2016, over two weeks after Mendez was searched at the airport, the images extracted from Mendez's phone were run through "ExifToolGUI v3.38." [Dkt. 85 at 68:12-69-3; Dkt. 50, p. 3].  This is a program that allows investigators to video metadata inside files, including file creation dates, the type of device that created the file, and geolocation data showing the latitude and longitude where the file was created. [Dkt. 85, p. 69:7-21; Dkt. 50, p. 3].  Agent Finnerty viewed the results of the ExifToolGUI metadata analysis, which showed creation dates, type of device, and geolocation data for many of the photos extracted from Mendez's phone. [Dkt. 85 at 69:7-70:8; 70:23-71:8; Dkt. 50 at 3]. Once again, all these actions were taken without a search warrant. [Dkt. 85 at 69:24-70:2; Dkt. 50, p. 3].

On March 10, 2016, Agent Finnerty applied for a warrant to search Mendez's apartment in Rosemont and the Northwest Side home of his parents, with whom he had been living. [Dkt. 50, p. 3]. Finnerty's affidavits for search warrant relied on the

results of the warrantless examinations of Mendez's cell phone and the resulting Facebook search purportedly linking the photos on Mendez's phone to Individual A. [Dkt. 50, p. 3]. Magistrate Mason approved the search warrant based on this information. [Dkt. 50, p. 3]. During the subsequent search of each residence, agents seized various items that the government sought to use in Mendez's prosecution, none of which potentially constitute contraband other than firearms seized from the home of Mendez's parents. [Dkt. 50, p. 3].

On March 11, 2016, multiple HSI agents, including Agent Finnerty, conducted surveillance on Individual A's home. [Dkt. 50, p. 3]. The agents approached Individual A after she left the residence, interviewed her at a coffee shop, and obtained a detailed statement. [Dkt. 50, p. 3]. Agents also seized various non-illicit items from Individual A's storage unit, which the government intended to use in Mr. Mendez's prosecution. [Dkt. 50, p. 3]. Among other things, Individual A told agents that Mendez used his work electronics to remotely delete information on his personal iPhone. [Dkt. 50, p. 3-4]. This led HSI Special Agents Dan Nugent and Tom Weingart to interview and obtain statements from Mendez's coworkers at DMG Mori USA the same day. [Dkt. 50, p. 4].

On March 18, 2016, Agent Finnerty applied for a warrant to search Mendez's work iPhone, iPad, and laptop. [Dkt. 50, p. 4]. Finnerty's affidavit for search warrant laid out the results of the examination of Mendez's personal cell phone, the Facebook search allegedly linking the photos on the phone to Individual A, and the interview of Individual A. [Dkt. 50, p. 4]. Magistrate Schenkier approved the warrant based on

this information. [Dkt. 50, p. 4]. Agents seized and searched Mendez's work iPhone, iPad, and laptop, obtaining various non-illicit information that the government intended to use in Mendez's prosecution. [Dkt. 50, p. 4].

After obtaining Mendez's Apple ID from his work iPad, Agent Finnerty applied for a warrant to search all information related to Mendez's Apple ID on March 24, 2016. [Dkt. 50, p. 4]. Finnerty's affidavit for search warrant included the information provided in her previous affidavits and the information obtained from Mendez's work electronics. [Dkt. 50, p. 4]. Magistrate Cole approved the warrant based on this information, although the record does not indicate what, if anything, was obtained as a result of this warrant. [Dkt. 50, p. 4]. On April 26, 2016, Mendez was indicted on four counts, alleging violations of 18 U.S.C. §§ 2251(a), 2252A(a)(1), 2252A(a)(5)(B). [Dkt. 50, p. 4].

Mr. Mendez filed a Motion to Suppress the evidence obtained as a result of the search of his cell phone [Dkt. 50], which the district court denied in a written opinion on July 28, 2021. [Dkt. 74]. The district court rejected Mr. Mendez's argument that a warrant was required to search his phone. [Dkt. 74, p. 4-9]. Relying on *United States v. Wanjiku*, 919 F.3d 472 (7th Cir. 2019), the district court found that there was reasonable suspicion to search Mendez's phone based on the following factors:

> …(1) Mendez was an adult male traveling by himself; (2) Mendez had significant prior travel; (3) he was traveling from Ecuador, which Officer Callison understood to be a potential source country for child trafficking; (4) in 2014, Mendez underwent a secondary inspection, and the customs report from that inspection stated that Mendez had been kidnapped and all his electronics taken and he was told to leave Mexico; (5) Mendez had prior arrests for child pornography and soliciting a minor; (6) he had a 2011 conviction for endangering the life or health of a child; and (7) when

11

> Callison met Mendez, Mendez was very condescending and gave the impression that CBP should be letting him go, which Callison believed showed Mendez attempting to deflect attention away from his inspection…

[Dkt. 74 at 11]. The district court acknowledged Callison's admission that pretty much any country could be a source of child pornography, but reasoned "this is only one factor" and "the law simply does not require law enforcement officials, including Customs inspectors, to be right every time." [Dkt. 74 at 12-13].

On March 9, 2022, Mendez entered a plea of guilty to a single count of producing child pornography (Count II) with all remaining counts dismissed on the motion of the Government. [Dkt. 91; Dkt. 135 p.3]. That plea agreement contained a specific provision that permitted Mendez to appeal the district court's denial of his Motion To Suppress. [Dkt. 91]. On March 8, 2023, Mendez was sentenced to 300 Months' imprisonment by the district court. [Dkt. 130]. This appeal followed. [Dkt. 133].

## SUMMARY OF ARGUMENT

Courts have grappled with how to square the holding of the United States Supreme Court in *Riley v. California*, 573 U.S. 373 (2014), which requires a warrant before searching a cell phone, and border search cases, which have allowed searches of persons and traditional physical objects to occur without a warrant, probable cause, or in some instances reasonable suspicion. In its previous two cases addressing the search of electronic devices at the border—*United States v. Wanjiku*, 919 F.3d 472 (7th Cir. 2019) and *United States v. Skaggs*, 25 F.4th 494 (7th Cir. 2022)—the Court declined to directly address this unsettled Fourth Amendment question. Instead, the Court, like others across the nation, determined that it could leave the issue for another day based on the good-faith exception to the exclusionary rule recognized in *Davis v. United States*, 564 U.S. 229 (2011). This exception applies where government agents rely upon binding precedent specifically authorizing the particular search conducted. Unlike some other Circuits, however, there is no binding precedent in this Circuit specifically authorizing the warrantless search of cell phones at the border. The opinions in *Wanjiku* and *Skaggs* thus stand in direct tension with *Davis* and a number of this Court's other decisions that refuse to apply the good-faith exception in the absence of specific binding authority.

The Court should not follow *Wanjiku* and *Skaggs* to uphold the warrantless search of Mr. Mendez's cell phone as he returned home from an international visit with his fiancée. If the *Davis* good-faith exception is applied to an unsettled question like this, government agents will have every incentive to continue pushing the boundaries of the Constitution, knowing that evidence will be excluded only if they violate

13

clearly established law. To maintain the deterrent value of Fourth Amendment juris-
prudence, the Court should apply the exclusionary rule as it always has post-*Davis*
and suppress the fruits of the warrantless search of Mr. Mendez's cell phone.

The clear holding in *Riley* is that cell phones cannot be analogized to the phys-
ical objects traditionally carried on one's person. Specifically, a citizen maintains a
reasonable expectation of privacy in a cell phone even though it is carried around as
a fact of modern life. In an area of law that governs the rights of thousands of people
on a daily basis, the Government cannot be allowed to continue to train its agents to
conduct invasive cell phone searches on citizens just because they occur at a border.
The Supreme Court has repeatedly recognized both the uniquely sensitive nature of
cell phones that routinely carry the innermost details of one's life, and the heightened
protections that they are afforded. The privacy interest in a cell phone is not reduced
simply because a citizen travels out of the country. The Court should reject the Gov-
ernment's attempt to shoehorn this digital age technology and its accompanying pri-
vacy concerns into the static border search rubric that would treat this uniquely per-
sonal item like many other ordinary objects. Instead, the Court should enforce the
warrant requirement of the Fourth Amendment and suppress the evidence obtained
as a result of this warrantless search.

Alternatively, even if the Court were to apply the lesser standard of reasonable
suspicion, it should find the grounds for this search lacking. At the suppression hear-
ing, the agent who conducted the search admitted that there was no information that
Mr. Mendez was engaged in a border crime at the time of the search. The

14

government's attempts to justify the search of Mr. Mendez's cell phone based on his previous criminal record, a trip to Mexico two years prior, the fact that he was returning from Ecuador, and his dissatisfaction with being selected for an intrusive examination and search, should be rejected. The government's speculation about these historical facts does not provide a particularized, objective suspicion that a border crime was afoot. As such, there was not even reasonable suspicion present here.

## STANDARD OF REVIEW

In reviewing the rulings of district courts on motions to suppress, a mixed standard of review is used. *United States v. Wilbourn,* 799 F.3d 900, 908 (7th Cir. 2015); *Ornelas v. United States,* 517 U.S. 690, 699 (1996). A district court's factual determinations are reviewed for clear error. *United States v. Etchin*, 614 F.3d 726, 733 (7th Cir. 2010). In contrast, its legal conclusions on the reasonableness and constitutionality of a search are reviewed *de novo. Ornelas*, 517 U.S. at 699 (generally, "determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal"); *United States v. Stokes*, 726 F.3d 880, 890 (7th Cir. 2013). The government bears the burden of showing by a preponderance of the evidence that its evidence is untainted. *United States v. Waletzki,* 124 F.3d 206 (7th Cir. 1997).

## ARGUMENT

The Court should reverse the district court's denial of the Motion to Suppress. *Wanjiku* should not determine the outcome here, because its interpretation of the *Davis* good faith exception is inconsistent with *Davis* and a number of this Court's other decisions applying the good faith exception. The Court should instead recognize the clear import of the holdings in *Riley* and the Supreme Court's related opinion in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), and hold that the warrant requirement of the Fourth Amendment does not disappear simply because a citizen brings his or her cell phone on an international trip. In refusing to apply the warrant requirement, the district court relied on *Wanjiku* to erroneously conclude that no more than reasonable suspicion was required for the search of Mr. Mendez's cell phone. The district court then erred further in finding that reasonable suspicion existed because Mr. Mendez was a male with a criminal record traveling alone outside the country. Notwithstanding the profile of Mr. Mendez, the fact remains that the government had no information he was actively involved in a border crime at the time of the search. Searching his cell phone based on the speculation that incriminating information might possibly be found offends the Fourth Amendment.

## I.    The Court Should Decline To Follow *Wanjiku* And *Skaggs*, Because The Good-Faith Exception Does Not Apply To The Unsettled Question Of Whether The Government Can Search A Citizen's Cell Phone At The Border

The Court should not apply the good faith exception here, as it did in *Wanjiku* and *Skaggs*. This version of the good-faith exception applies only where binding appellate precedent specifically authorized the particular police practice. *Davis v. U.S.*,

16

564 U.S. 229, 241 (2011). The underlying rationale is that the exclusionary rule is meant to "compel respect for the constitutional guaranty," and does not achieve a deterrent effect in instances where police have "scrupulously adhered to governing law." *Id.* at 249. *Davis* does not apply to "the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled." *Id.* at 250 (J. Sotomayor, *concurring*). Where the law is unsettled, the exclusionary rule remains an important deterrent, for, without it, "law enforcement officials would have little incentive to err on the side of constitutional behavior." *Id.*, *quoting U.S. v. Johnson*, 457 U.S. 537, 561 (1982).

The unsettled situation before this Court is markedly different than the one in *Davis*. In *Davis*, the Supreme Court applied the good-faith exception to the post-arrest search of the passenger compartment of an automobile that followed long standing and binding precedent "to the letter." 564 U.S. at 239. At the time of the search, the Eleventh Circuit's interpretation of *New York v. Belton*, 453 U.S. 454 (1981), categorically authorized the search of an automobile's passenger compartment incident to an arrest of the passenger, although the Supreme Court overruled this practice in *Arizona v. Gant*, 556 U.S. 332. *Davis*, 564 U.S. at 233-34, 39. All agreed the search "was in strict compliance with then-binding Circuit law." *Id.* at 239. It was under these legally settled circumstances that the Court found exclusion inappropriate, because "[a]bout all that exclusion would deter in this case is conscientious police work" and "[t]he deterrent effect of exclusion is such a case can only be to discourage the officer from 'doing his duty.'" *Id.* at 241, *quoting U.S. v. Leon*, 468 U.S. 897, 920 (1984).

17

As Justice Sotomayor made clear in her concurring opinion, the Court did not address "the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled." *Id.* at 250 (J. Sotomayor, *concurring*).

Since *Davis*, this Court's decisions have repeatedly taught that the *Davis* exception applies only where precedent "specifically authorized" the search and "does not reach so far as to excuse efforts to extend controlling precedents." *U.S. v. Jenkins*, 850 F.3d 912, 920 (7th Cir. 2017); *see also U.S. v. Banks*, 60 F. 4th 386, 390-91 (7th Cir. 2023) (declining to apply good faith exception based on government's attempt to expand previous precedent); *U.S. v. Berrios*, 990 F.3d 528, 530 (7th Cir. 2021) ("In keeping with our approach in a number of earlier decisions, which have followed the caveat in Justice Sotomayor's opinion in *Davis*, we decline again to apply *Davis* 'to excuse mistaken efforts to *extend* controlling precedents.'"), *quoting Jenkins*, 850 F.3d at 920; *U.S. v. Whitaker*, 820 F.3d 849, 854-55 (7th Cir. 2016) (finding that good-faith exception did not apply in the absence of binding appellate precedent specifically authorizing particular police practice); *U.S. v. Martin*, 712 F.3d 1080, 1082 (7th Cir. 2013) ("The Supreme Court may decide to expand *Davis* in the coming years, but until it does so, we are bound to continue applying the traditional remedy of exclusion when the government seeks to introduce evidence that is the 'fruit' of an unconstitutional search.").

Both *Wanjiku* and *Skaggs* failed to appreciate that the mere fact a search may fall under the general rule of previous cases is insufficient to invoke the *Davis*

exception. *Jenkins*, 850 F.3d at 920. "*Davis* requires a more exacting analysis" of whether the search was "specifically authorized" by controlling precedent. *Id.* This more exacting analysis is evident in the Court's prior decisions. For example, in *Berrios*, the Court declined to apply the *Davis* exception to the post-arrest search of a cell phone where the government admitted the search was invalid under *Riley v. California*, 573 U.S. 373 (2014), but argued that "the law at the time of the search did not prohibit it." 990 F.3d at 530. Although Circuit precedent prior to *Riley* clearly recognized the general rule that police may search an arrestee's personal effects incident to arrest and even upheld the post-arrest search of a cell phone for its phone number, the Court found this insufficient to grant the government the benefit of this limited exception. *Id.* at 532-33.

In finding a lack of authority to specifically authorize the search and apply the good faith exception, the *Berrios* Court carefully examined the specific holdings of the cases that applied at the time of the search. The Court determined that the government could not rely upon *United States v. Flores-Lopez*, 670 F.3d 803 (7th Cir. 2012), because the post-arrest search of the defendant's cell phone was limited to obtaining the defendant's phone number and did not involve the contents of the phone. 990 F.3d at 532. The *Berrios* Court explained that "the only point clearly established by *Flores-Lopez* was that a search limited to those items was constitutional," and that *Flores-Lopez* did not authorize the more comprehensive search of the contacts, call logs, text messages, and photographs inside Berrios' phone. *Id.* at 530, 533.

19

The *Berrios* Court likewise distinguished its decision in *United States v. Gary*, 790 F.3d 704 (7th Cir. 2015), which applied the *Davis* exception to a post-arrest search of the defendant's cell phone for defendant's phone number and log of received calls. 990 F.3d 533. The *Gary* Court found this limited search of the phone number and call log authorized under pre-*Riley* case law that did not differentiate between physical items and digital data in searches incident to arrest. *Gary*, 790 F.3d at 710, *citing U.S. v. Ortiz*, 84 F.3d 977 (7th Cir. 1996) (upholding search incident to arrest of electronic pager for "the same limited information"), The *Berrios* Court, however, refused to extend this reasoning to authorize the search of the contents of Berrios' phone. *Berrios*, 990 F.3d 533. As the Court explained, "[n]either *Flores-Lopez* nor *Gary* authorized a wholesale search of a cellphone, beyond the limits that were present in those two cases." *Id*.

The government's interpretation of the *Davis* exception is more akin to the civil doctrine of qualified immunity, which is actually the converse of *Davis* exception. Whereas qualified immunity shields officers from liability unless they violate clearly established law, the *Davis* exception applies in the reverse. *Davis* does not let the government off the hook unless there is clear authorization for the particular search conducted. *U.S. v. Diggs*, 385 F. Supp. 3d 648, 660 (N.D. Ill. 2019) (contrasting *Davis* exception from qualified immunity); *see also Whitaker*, 820 F.3d at 854-55 (declining to apply *Davis* exception to warrantless K-9 sniff of hallway outside defendant's apartment; although there was no recognized expectation of privacy in such a common area at the time of the search, neither was there an appellate decision

"specifically authoriz[ing] the use of a super-sensitive instrument, a drug-detecting dog, by the police outside an apartment door to investigate the inside of the apartment without a warrant"); *U.S. v. Taylor*, 776 F.3d 513, 519 (7th Cir. 2015) (attachment of GPS tracking device to vehicle in public area was authorized by then-binding precedent that attaching a GPS unit to a car parked on a public street was not a search).

The application of the *Davis* exception in *Wanjiku* and *Skaggs* is inconsistent with these principles. *Wanjiku*, in fact, explicitly commented on the absence of specific controlling authority in this area. 919 F.3d at 482 ("our court has yet to confront the precise issue presented here—a non-destructive search of the contends of electronic devices at the border"), 919 F.3d at 487 (noting that defendant conceded at suppression hearing that the law was unsettled). Rather than continue to adhere to the number of decisions declining to apply the *Davis* exception in the absence of specific binding authority, *see, e.g. Berrios*, 900 F.3d at 530, *Wanjiku* turned *Davis* on its head and used the absence of authority as a reason to apply the good faith exception to the search of electronic devices at the border, 919 F.3d at 485 (applying exception because "[n]o court required probable cause and a warrant for a border search of any property" at the time of the search).

Relying upon the general rule expressed in *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985) and *United States v. Flores-Montano,* 541 U.S. 149 (2004), *Wanjiku* eschewed the "more exacting analysis" that *Davis* and this Circuit's precedent demands. *Jenkins*, 850 F.3d at 920. It found the search of the defendant's

cell phone, hard drive, and laptop defensible under the general border search principles applied more than 30 years earlier to the search for a drug-filled balloon in *Montoya de Hernandez* and 15 years previously to the search of a gas tank in *Flores-Montano*. 919 F.3d at 481-82, 85. And, at the same time, it dismissed *Riley's* more recent ruling regarding the unique and ubiquitous nature of cell phones as not specific enough to factor into the analysis. *Id.* at 484 (noting that *Riley* did not address searches at the border or data stored on electronic devices such as portable hard drives and laptops).

This led *Wanjiku* to the erroneous conclusion that agents "possessed an objectively good faith belief that their conduct ***did not violate*** the Fourth Amendment," *Id.* at 486 (emphasis added), and *Skaggs* to the similar statement that "officials had a good faith belief that the search ***did not violate*** the Fourth Amendment." 25 F.4th at 500 (emphasis added). The *Davis* exception, however, does not apply merely because agents have a good-faith belief they're not violating the law. What *Davis* requires is controlling precedent specifically authorizing the particular search at issue. 564 U.S. at 241 (good-faith exception applies "when binding appellate precedent specifically *authorizes* a particular police practice") (emphasis in original). And, as *Wanjiku* itself recognized, there is no such precedent specifically authorizing the warrantless search of electronic devices at the border. 919 F.3d at 482 ("our court has yet to confront the precise issue presented here—a non-destructive search of the contents of electronic devices at the border").

22

Contrary to the foundational underpinnings of *Wanjiku* and *Skaggs*, previous border cases are a poor analog and do not provide the specific authorization needed to apply the *Davis* good-faith exception to the search of a modern cell phone. *Berrios*, 990 F.3d 532-33. *Montoya de Hernandez* held that "the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." 473 U.S. at 541. *Flores-Montano* held that "the Government's authority to conduct suspicionless inspections at the border includes the authority to remove, disassemble, and reassemble a vehicle's fuel tank." 541 U.S. at 155. Neither case specifically authorizes the search of a cell phone and the potentially vast amounts of personal information it contains. *Riley*, 573 U.S. at 397 ("Such a search would be like finding a key in a suspect's pocket and arguing that it allowed law enforcement to unlock and search a house.").

Likewise inapposite are the three Seventh Circuit border search cases to which *Wanjiku* cited—*Kaniff v. United States*, 351 F.3d 780, 784 (7th Cir. 2003) (pat down and partial strip and visual cavity search), *United States v. Yang*, 286 F.3d 940 (7th Cir. 2002) (luggage search), and *United States v. Johnson*, 991 F.2d 1287, 982-83 (7th Cir. 1993) (luggage search). While these opinions reiterate general border search principles, none of them provide the specific authorization for the search of a cell phone that would be needed for the *Davis* exception to apply. If previous Circuit precedent permitting the limited search of a cell phone incident to arrest did not authorize

23

the search of a cell phone's contents incident to arrest in *Berrios*, then previous decisions regarding luggage and body searches at the border cannot authorize the border search of a citizen's cell phone here. *Berrios*, 990 F.3d 532-33; *see also U.S. v. Garcia*, 68 F. Supp. 3d 1113, 1119-20 (N.D. Cal. 2014) ("The purposes of, and expectations surrounding, a cigarette pack and a cell phone are so different that it cannot reasonably said that a case permitting the search of one object 'specifically authorized' the search of the other, particularly given that cell phones were not even a glint in the eye of the courts in 1973.")

Nor do the other Circuit decisions cited by *Wanjiku* provide the authority needed to invoke the *Davis* exception. 919 F.3d at 485. "Key" to the decision in *Davis* "is the idea of *binding* precedent." *Berrios*, 990 F.3d at 532 (emphasis in original). Binding precedent "is precedent governing the jurisdiction in which the officers are acting—that is, Supreme Court decisions and that jurisdiction's circuit decisions." *Diggs*, 385 F. Supp. 3d at 659. Other Circuit decisions do not provide the specific authority needed to invoke the *Davis* exception. *Id.* Moreover, only one of the other Circuit opinions cited in *Wanjiku—United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013)—was actually issued prior to the search of Wanjiku in 2015 or Mendez here in 2016. 919 F.3d at 485. This is hardly the type of binding precedent necessary to support the application of the *Davis* exception.

The Court should therefore decline to follow the faulty reasoning of *Wanjiku* and *Skaggs* and refuse to apply the *Davis* good-faith exception here where no authority specifically authorized the government's search. This is consistent with a number

of its decisions on point. *See supra* pg. 17-18. Following the reasoning of *Wanjiku* and

*Skaggs* would eviscerate the exclusionary rule and permit the government to use the

fruits of an illegal search whenever its agents could reasonably argue they were not

violating the law. As Justice Sotomayor recognized in *Davis*, such a standard would

actually encourage unconstitutional searches by government agents who'd have noth-

ing to lose as long as the government could articulate arguable grounds for their ac-

tions:

> …in close cases, law enforcement officials would have little incentive to
> err on the side of constitutional behavior. Official awareness of the dubi-
> ous constitutionality of a practice would be counterbalanced by official
> certainty that, so long as the Fourth Amendment law in the area re-
> mained unsettled, evidence obtained through the questionable practice
> would be excluded only in the one case definitively resolving the unset-
> tled question…

564, U.S. 229, 250-51 (J. Sotomayor, concurring), *quoting U.S. v. Johnson*, 457
U.S. 537, 561 (1982).

True, government power may be at its zenith at the border. That, however, is

even more reason why the exclusionary rule should apply to Fourth Amendment vio-

lations there. Avoiding the seemingly unsavory application of the rule in these cases

has only stunted the law's adaptation to modern technology and allowed the govern-

ment's broad powers to remain virtually unchecked by rules from a different era. *See,*

*e.g., U.S. v. Kamaldoss*, No. 19-CR-543 (ARR), 2022 WL 1200776, at *12 (E.D.N.Y.

Apr. 22, 2022) ("But the time for such a decision is not now. In the face of conflicting

circuit precedent and the absence of any guidance from the Second Circuit on

searches of digital devices at the border, I leave this matter for a later date and a

higher court.") What is left is a prototypical example of Lord Acton's warning about the dangers of absolute power corrupting absolutely.

The time is always right to do what is right. While the exclusionary rule necessarily comes with a price, it is the price we must pay to live in a nation where citizens remain secure in their persons, houses, papers, and effects rather than a pseudo-police state where government agents rummage through the privacies of citizens' lives in search of a crime. Allowing the government to wrap itself in the broad blanket of good faith, as it did in *Wanjiku* and *Skaggs*, would leave none of us truly secure. If this search violated the Fourth Amendment, the Court should not hesitate the apply the exclusionary rule as it always has and suppress the fruits of the government's search.

## II. The Court Should Apply The Reasoning Of *Riley* And *Carpenter* And Reverse The Denial Of The Motion To Suppress Because The Fourth Amendment Requires Probable Cause And A Warrant To Search A Citizen's Cell Phone

The Court should apply the reasoning of *Riley* and *Carpenter* and hold that the Fourth Amendment's protection against the warrantless search of a cell phone does not fade away anytime a citizen chooses to travel abroad in this increasingly digital and globalized world. Permitting an intrusive search of Mr. Mendez's cell phone is inconsistent with the foundational principals of the Fourth Amendment. The Fourth Amendment was adopted as "the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley*, 573 U.S. at 403. "Opposition to such searches was in fact one of the

driving forces behind the Revolution itself." *Id.* Even as technology has advanced, the Supreme Court has sought to "'assure [] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" *Carpenter*, 138 S. Ct. at 2214, *quoting Kyllo v. United States*, 533 U.S. 27, 34 (2001). Two guideposts govern this balancing test: "[f]irst, that the Amendment seeks to secure the privacies of life against arbitrary power;" and "[s]econd, and relatedly, that a central aim of the Framers was to place obstacles in the way of a too permeating police surveillance." *Id.* at 2213.

It is axiomatic that warrantless searches "are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). The government bears the burden of establishing an exception when it conducts a warrantless search. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). Whether the government can meet its burden depends upon what was considered an unreasonable search and seizure when the Fourth Amendment was adopted. *Riley v. California*, 573 U.S. 373, 385 (2014); *Carpenter v. U.S.*, 138 S. Ct. 2206, 2213-14 (2018). In the absence of more specific justification from the founding era, the government must show that "the degree to which [a warrantless search] intrudes upon an individual's privacy" is outweighed by "the degree to which it is needed for the promotion of legitimate governmental interests." *Riley*, 573 U.S. at 385. This same balancing test applies when assessing searches conducted under the border exception to the warrant requirement. *Montoya de Hernandez*, 473 U.S. at 537. Where the search of a "particular category

of effects would untether [the exception] from the justifications underlying [it]," a warrant is required. *Riley*, 573 U.S. at 386, *quoting Gant*, 556 U.S. at 343.

### A.    The Supreme Court's Border Search Precedents Do Not Support The Warrantless Search Of A Citizen's Cell Phone

The Supreme Court's border search precedents do not justify the warrantless search of a citizen's cell phone. "For much of our history, Fourth Amendment search doctrine was 'tied to common-law trespass' and focused on whether the Government 'obtains information by physically intruding on a constitutionally protected area.'" *Carpenter*, 138 S. Ct. at 2213, *quoting United States v. Jones*, 565 U.S. 400, 405, 406, n.3. As technology advanced, the Supreme Court "expanded [its] conception of the Amendment to protect certain expectations of privacy as well," even when individuals ventured into public areas. *Carpenter*, 138 S. Ct. at 2213, 2217, *citing Katz v. United States*, 389 U.S. 347, 351 (1967). Beginning with the touchstone set forth in *Katz* that "'the Fourth Amendment protects people, not places,'" the Supreme Court has recognized that "[w]hen an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable…official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Id.*

Border search jurisprudence, however, is rooted in dated and pre-*Katz* thinking about what physical items may be subject to search. The Supreme Court recognized the border exception in *Boyd v. United States*, 116 U.S. 616 (1886), eighty years before *Katz*, in an era where all Fourth Amendment violations were assessed based on physical intrusions. The *Boyd* court found historical justification for the border

search exception in the 1789 Collection Act, which allowed customs officers to search "any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed." 116 U.S. at 623; *U.S. v. Ramsey*, 431 U.S. 606, 616-17 (1977). *Boyd* reasoned that, because "this act was passed by the same congress which proposed for adoption the original amendments to the constitution," it was clear that "members of that body did not regard searches and seizures of this kind as 'unreasonable,' and they are not embraced within the prohibition of the amendment." 116 U.S. at 623; *see also Carrol v. United States*, 267 U.S. 132, 150-51 (1925) (noting the border exception as recognized by *Boyd*).

Even the Collection Act that served as the foundation for the creation of the border search, however, distinguished warrantless searches of ships from searches of houses, stores, buildings, or other places. *Ramsey*, 431 U.S. at 616-17. To search houses, stores, buildings, or other places, the Act required customs officers to go before a justice of the peace and obtain a warrant. *Id.* at 616, n. 12. And it conferred no authority to search an individual's papers. *The Border Search Muddle*, 132 Harv. L. Rev. 2278, 2293 (2019) (The Act "says nothing about papers or their equivalent"). This physical distinction between ships and houses and papers made sense in the founding era, for "[i]n late eighteenth-century thought, ships were neither 'houses, papers, and effects' nor 'places.' They were ships." Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 MICH L. REV. 547, 605-06 (1999).

When the Supreme Court later applied the border exception in *Ramsey*, it adopted *Boyd*'s interpretation of the Collection Act and determined that "no extended

demonstration" was necessary to establish that border searches are reasonable "simply by virtue of the fact that they occur at the border." 431 U.S. at 616-17. Following this pre-*Katz*, trespass line of thinking, *Ramsey* declared that, "[f]rom before the adoption of the Fourth Amendment, border searches have been considered reasonable "***by the single fact that the person or item in question had entered into our country from outside***." *Id.* at 616, 619 (emphasis added). *Ramsey*, however, failed to consider whether there was a reasonable expectation of privacy under *Katz*; in fact, it did not mention *Katz* at all. Nor was there much reason to, as *Ramsey* involved the opening of bulky envelopes suspected to contain contraband,  not the review of any correspondence inside. *Id.* at 609, 623-24. As *Ramsey* noted, "here envelopes are opened at the border only when customs officers have reason to believe they contain other than correspondence, while the reading of any correspondence inside the envelopes is forbidden." *Id.* at 624. As such, the Court was applying the border search in a way that was limited not only to place but also to the level of intrusion on private and sensitive materials.

A similar rationale animated the Supreme Court's opinion in *Montoya de Hernandez*, which considered the temporary detention of a traveler and the search of her person. 473 U.S. at 533-35. While *Montoya de Hernandez* employed a more nuanced balancing of interests than *Ramsey* or *Boyd*, the majority opinion likewise never mentioned paradigm shift recognized in *Katz*. Instead, it relied on *Carrol* for the proposition that "the expectation of privacy [is] less at the border than in the interior," 473 U.S. at 539-40, and *Ramsey* and *Boyd* for the proposition that "[c]onsistently…with

Congress' power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior, *id.* at 537-38.

Similarly, in *Flores-Montano*, the Supreme Court upheld the routine inspection of a vehicle's gas tank, citing to "the impressive historical pedigree" found in the Collection Act, 541 U.S. at 153, and the statement in *Ramsey* that "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." 541 U.S. at 152-53, *quoting Ramsey*, 431 U.S. at 616; *see also United States v. Villamonte-Marquez*, 462 U.S. 579, 585 (1983) (finding "impressive historical pedigree" for detention and search of ship in statute enacted by the First Congress).

The Supreme Court has never suggested that its precedents regarding the search of persons and physical objects at the border can be applied to anything like a modern cell phone. In fact, the Supreme Court has indicated the opposite. Although *Riley* is not a border search case, it is predicated on the idea that a cell phone is not analogous to a traditional physical object that might be found on someone's person and, as such, it cannot be treated in a similar manner. 573 U.S. at 386 ("A search of the information on a cell phone bears little resemblance to the type of brief physical search considered in [previous precedent]."), 573 U.S. at 393 ("Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person."); *see also United States v. Vergara*, 884 F.3d 1309, 1315 (11th

Cir. 2018) (J. Pryor, *dissenting*) ("As the Supreme Court made clear in *Riley*, cell phones are fundamentally different from any object traditionally subject to government search at the border."); *United States v. Kim*, 103 F. Supp. 3d 32, 55 (D.D.C. 2015) ("[*Riley*] did strongly indicate that a digital data storage device cannot fairly be compared to an ordinary container when evaluating the privacy concerns involved").

Absent from the district court's analysis is an appreciation of the unique nature of the modern-day cell phone. To say a cell phone is like an ordinary personal effect, *Riley* explained, "is like saying a ride on horseback is materially indistinguishable from a flight to the moon." 573 U.S. at 393. "Both are ways of getting from point A to point B, but little else justifies lumping them together." *Id.* Thus, as *Riley* instructs, the Court must resist a "mechanical application" of precedent regarding the search of traditional physical objects to the search of a cell phone. *Id.* at 386; *see also Carpenter*, 138 S. Ct. at 2222 ("When confronting new concerns wrought by digital technology, this Court has been careful not to uncritically extend existing precedents.").

*Wanjiku* and *Skaggs* did not directly address these instructions from *Riley* and *Carpenter*. While *Wanjiku* acknowledged that *Riley* and *Carpenter* granted "heightened protection to cell phone data," it found it unnecessary to determine the impact of their holdings on searches of electronic devices at the border. *Wanjiku*, 919 F.3d at 484. Instead, because neither *Riley* or *Carpenter* addressed border searches, this Court declined to decide the ultimate issue and rested its decision on the good-faith exception. *Wanjiku*, 919 F.3d at 484-85. Just as the Supreme Court was forced to adapt historical precedents to cell phone technology and the digital age, this Court

32

must do the same and cannot let the Collection Act and the vestiges of *Boyd* dictate that place controls over all other considerations. The Court should take this opportunity to squarely address the issue and recognize the clear import of *Riley* and *Carpenter*—the Supreme Court's border search jurisprudence cannot justify the warrantless search of a citizen's cell phone as if it was a ship, an envelope, or a gas tank.

### B.    A Warrantless Search Of A Citizen's Cell Phone At The Border Is An Unreasonable Invasion Of Privacy

The Government has failed to meet its burden of showing that a citizen loses the reasonable expectation of privacy in a cell phone simply because he or she takes an international trip. *See Basinski*, 226 F.3d at 833. Where, as here, "privacy-related concerns are weighty enough a search may require a warrant, notwithstanding the diminished expectations of privacy of the [individual]." *Riley*, 573 U.S. at 402. That there is generally reduced privacy at the border does not mean that citizens surrender the vast digital record of their lives as contained on their phones simply by virtue of travelling abroad. *See id.* A cell phone search typically exposes the government to far more than the most exhaustive search of a house, which the First Congress of course agreed required probable cause and a warrant. *Id.* at 396-97. "The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought." *Id.* at 403.

Critical to a faithful application the Fourth Amendment in this context are the teachings of *Riley* that "[c]ell phones differ in both a quantitative and qualitative sense from other objects that might be kept on an [individual's] person." *Id.* at 393.

Prior to cell phones, "a search of the person was limited by physical realities and tended as a general matter to constitute only a narrow intrusion on privacy." *Id.* "[P]eople did not typically carry a cache a sensitive personal information with them as they went about their day." *Id.* at 395. They did not "lug around every piece of mail they have received for the past several months, every picture they have taken, or every book or article they have read—nor [did] they have any reason to attempt to do so." *Id.* at 393-94.

The unique and intensely personal nature of electronic devices cannot be understated. As recognized in *Riley*: "Today, by contrast, it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate." *Id.* at 395. This digital record may contain a massive amount and wide variety of personal information, including photographs, picture messages, text messages, an Internet browsing history, a calendar, a phone book, notes, prescriptions, bank statements, videos, historic location information, and apps that manage detailed information about all aspects of a person's life. *Id.* at 394-96. Access to this digital record would allow the government to reconstruct "[t]he sum of an individual's private life" and their "specific movements down to the minute." *Id.* at 394, 396. This includes identifying—as the government did here—a location "within a particular building." *Id.* at 396.

The government did not offer any compelling reason below why a citizen of this nation should expect to lose privacy in this vast trove of sensitive personal

information simply because a cell phone is brought on an international trip. Searching a person's cell phone is far more invasive than "ransacking his house for everything which may incriminate him." *Id.* at 396. This is so because a cell phone "contains a broad array of private information never found in a home in any form—unless the phone is." *Id.* at 397. The notion that a citizen surrenders this information as a condition of leaving the country should not be an acceptable tenet of American constitutional jurisprudence. *Id.* at 403; *United States v. Smith*, No. 22-CR-352 (JSR), 2023 WL 3358357, at *8 (S.D.N.Y. May 11, 2023) ("Technological and cultural changes now mean that nearly all travelers carry with them, in additional to any physical items, a digital record of more information than could likely be found through a thorough search of that person's home, car, office, mail, and phone, financial and medical records, and more besides. No traveler would reasonably expect to forfeit privacy interests in all this simply by carrying a cell phone when returning home from an international trip."); *Vergara*, 884 F.3d at 1315 (J. Pryor, *dissenting*) (traveler maintains expectation of privacy in cell phone even though privacy interests are diminished at the border). This is especially true where all cell phones are routinely password protected to guard against invasion not only by government, but even from family, friends, and those closest to its owner.

Other circuit opinions, like those cited in *Wanjiku*, fail to explain why the search of a cell phone should be treated like the traditional searches of objects and people at issue in previous border cases. The Supreme Court provided a detailed analysis as to how these devices are so different only to have these courts close their

collective eyes to the facts that are apparent to all. These courts simply assume—without any persuasive reasoning—that a cell phone should be analyzed like a non-routine alimentary canal search or, worse still, a routine search of a gas tank. If *Riley* and *Carpenter* say anything, it is that such faulty analogies to precedents from a by-gone era cannot win the day. *Riley*, 573 U.S. at 386 (rejecting government's "mechanical application" of previous precedents); *Carpenter*, 138 S. Ct. at 2222 ("When confronting new concerns wrought by digital technology, this Court has been careful not to uncritically extend existing precedents.").

### C.   The Government's Interests And Claims Of Efficiency Do Not Justify The Warrantless Search Of A Cell Phone At The Border

The Government likewise cannot show any compelling interest or exigency sufficient to bypass the warrant requirement of the Fourth Amendment. The Supreme Court has articulated two primary government interests supporting the border exception—collection of duties and interdiction of contraband. *Montoya de Hernandez*, 473 U.S. at 537; *Ramsey*, 431 U.S. at 616-17; *Carroll v. U.S.*, 267 U.S. 132, 154 (1925). These interests do not include general crime-detection. *U.S. v. Aigbekaen*, 943 F.3d 713, 724 (4th Cir. 2019) ("the Government may not 'invoke[ ] the border exception on behalf of its generalized interest in law enforcement and combatting crime'"), *quoting United States v. Kolsuz*, 890 F.3d 133, 143 (4th Cir. 2018); *see also Riley*, 573 U.S. at 382 ("where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing,...reasonableness generally requires the obtaining of a judicial warrant"), *quoting Vernonia School Dist. 47J v. Action*, 515 U.S. 646, 653 (1995).

The nature of digital contraband is untethered from either of the justifications underlying the border exception. Border searches do little to combat the flow of digital contraband, which can be distributed remotely around the world without the need for smugglers to cross a physical border. *Vergara*, 884 F.3d at 1317 (J. Pryor, dissenting) ("cell phone searches are ill suited to prevent the type of contraband that may be present on a cell phone from entering into the United States. Unlike physical contraband, electronic contraband is borderless and can be accessed and viewed in the United States without ever having crossed a physical border.").

A cell phone search becomes even more attenuated from the rationale underlying the border exception considering that officers searching the phone will often have no idea whether the information being reviewed is actually stored on the phone itself or, instead, remotely in the cloud far away from the border. This is especially so here where agents cracked an application known as iSafe. *Riley*, 573 U.S. at 397 ("the same type of data may be stored locally on the device for one user and in the cloud for another...officers searching a phone's data would not typically know whether the information they are viewing was stored locally at the time of the [search] or has been pulled from the cloud"); *Smith*, 2023 WL 3358357, at *8 (data on cell phone likely exists on faraway servers inside the country; "Stopping the cell phone from entering the country would not, in other words, mean stopping the data contained on it from entering the country").

Ultimately, however, whatever benefits the government may obtain from warrantless cell phone searches at the border are insufficient to justify the attendant

privacy costs and degradation of Fourth Amendment protections. The warrant requirement is not just simply "'an inconvenience to be somehow 'weighed' against the claims of police efficiency." *Riley*, 573 U.S. at 401, *quoting Coolidge v. New Hampshire,* 403 U.S. 443, 481 (1971). This is all the more so when technology allows warrant applications to be processed efficiently in a timely manner. *Id.*

Nor is there any valid reason why, after seizing a cell phone at the border, the government should be allowed to continue searching the phone with data and metadata extraction tools without applying for a warrant, as it did here. *Id.*; *Aigbekaen*, 943 F.3d at 722 (given information already possessed, it was only reasonable to expect government to procure warrants); *see also United States v. Lickers*, 928 F.3d 609, 614 (7th Cir. 2019) (police seized cell phone, laptop, and digital camera pursuant to inventory search of car and then applied for warrant authorizing a search of these devices). The Government should not be allowed to sweep its failure to seek a warrant before employing these more invasive electronic means aside by simply declaring that they were all part of and incident to its initial search. The Government cannot simultaneously be allowed to claim that the search was limited in scope on one hand and that all of the information it subsequently obtained from its warrantless extraction of data on subsequent occasions was part of that original search.

Simply put, the Fourth Amendment warrant requirement is not merely an aspiration to be ignored at the government's convenience. *Id.* When the government attempts to invade the privacy of a citizen's cell phone, a warrant is required. *Riley*, 573 U.S. at 403. Only by maintaining steadfast in our commitment to this safeguard

may we maintain the same level of privacy from government that existed at the time the Fourth Amendment was adopted, and for which the founding generation and the many since then fought to preserve. Just as the founding generation fought for the privacy of their homes, so too must we stand against increasingly permeating government surveillance in the modern era. This means requiring probable cause and a warrant before the government may rummage through our cell phones and all the privacies of life they contain. *Riley*, 573 U.S. at 403; *Carpenter*, 138 S. Ct. at 2214; *Katz*, 389 U.S. at 351. Otherwise, privacy as we know it will cease to exist. All the ink spilled for two centuries about our Fourth Amendment will not bring it back. It will only read like the end credits for American liberty.

## III. Even Were The Court Not To Apply The Fourth Amendment Warrant Requirement, The Court Should Reverse Based On The Absence Of Reasonable Suspicion Supporting This Search

Even were this Court to apply the border exception, the Court should still reverse the district court's denial of Mr. Mendez's Motion To Suppress. The search of Mr. Mendez's cell phone was not supported by reasonable suspicion that he was actively using the phone to smuggle contraband. The district court's finding of reasonable suspicion largely depended on a profile of Mr. Mendez as a male with a previous misdemeanor conviction for a child-related offense who was returning from a trip to Ecuador, after previously travelling to Mexico two years prior. That is all the agents knew when they made the decision to search Mendez before he even disembarked from his flight. The gratuitous testimony of Agent Callison that Mr. Mendez was less than happy about being stopped for a secondary inspection after a long international flight at midnight added nothing of value to the calculus. Agent Callison undercut

any semblance of reasonable suspicion when he admitted that he had no information that Mr. Mendez was actively engaged in a crime when he crossed the border and that pretty much any country could be a source country for digital contraband. While the district court relied on the fact that the government does not always have to be right, it failed to "prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure." *United States v. Martinez-Fuerte*, 428 U.S. 543, 565 (1976). Where Agent Callison conceded there was no information that Mr. Mendez was actively violating any laws at the time of the search, this search was supported by little more than a hunch that a search of a cell phone belonging to a person with Mr. Mendez's characteristics might prove fruitful. This type of general hunch, however, is insufficient to justify the substantial invasion of privacy involved in a cell phone search.

### A.    The Privacy Interest In A Cell Phone Requires, At The Very Least, The Government To Have Reasonable Suspicion That It Contains Digital Contraband

The significant privacy interests implicated by a cell phone search should require, at the very least, reasonable suspicion. Opinions which do not require any suspicion ignore the clear import of the Supreme Court's decisions in *Riley* and *Carpenter* and rest on the erroneous notion that a cell phone can be treated as any other physical object. *See, e.g., United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018) ("We see no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property. Just as the United States is entitled to search a fuel tank for drugs, it is entitled to search a flash drive for child pornography. And it does not make

sense to say that electronic devices should receive special treatment because so many people now own them or because they can store vast quantities of records or effects.")

Of paramount import is the proper analytical framework. The reasonable suspicion required under the border exception is reasonable suspicion that the individual is smuggling contraband across the border – not reasonable suspicion that he may have committed a crime at some other time or place. *Kaniff v. United States*, 351 F.3d 780, 785 (7th Cir. 2003) ("As the Supreme Court has explained, reasonable suspicion requires 'a particularized and objective basis for suspecting the particular person' of concealing contraband."), *quoting Montoya de Hernandez*, 473 U.S. at 541-42; *United States v. Johnson*, 991 F.2d 1287, 1291 (7th Cir. 1993) (same).

Permitting the government to search a cell phone based on suspicion that it may potentially contain evidence of an unspecified non-border crime would, in the words of *Riley* and *Gant*, untether the border exception from the justifications underlying it. *Riley*, 573 U.S. at 386, *quoting Gant*, 556 U.S. at 343; *U.S. v. Aigbekaen*, 943 F.3d 713, 724 (4th Cir. 2019) ("the Government may not 'invoke[ ] the border exception on behalf of its generalized interest in law enforcement and combatting crime'"); *United States v. Cano*, 934 F.3d 1002, 1018-19 (9th Cir. 2019) ("the border search exception authorizes warrantless searches of a cell phone only to determine whether the phone contains contraband. A broader search cannot be justified by the particular purposes served by the exception"). Therefore, if the Court does not apply the warrant requirement, the Court should at the very least require reasonable suspicion that a

border crime is afoot before allowing the government to search a citizen's cell phone at the border.

### B.     There Was No Reasonable Suspicion For This Search

The search of Mr. Mendez's cell phone was not supported by reasonable suspicion that he was actively using the phone to smuggle contraband or commit a border crime. Reasonable suspicion requires "'a particularized and objective basis for suspecting the particular person of concealing contraband.'" *Kaniff*, 351 F.3d at 785, *quoting Montoya de Hernandez*, 473 at 541-42. While reasonable suspicion is less than probable cause, it must be supported by more than an inchoate hunch, speculation, or guesswork. *Terry v. Ohio,* 392 U.S. 1, 27 (1968); *United States v. Jerez*, 108 F.3d 684, 693 (7th Cir. 1997).

So much of the reasonable suspicion in this case is based on a rather generic profile that lacks much specificity concerning Mr. Mendez. Reasonable suspicion, however, does not arise because an individual fits a certain profile. In *Reid v. Georgia*, the Supreme Court found that a drug enforcement agent lacked reasonable suspicion to stop a traveler at an airport who fit a "drug-courier profile" in that he arrived from a principal place of origin of cocaine, early in the morning, with no luggage other than a shoulder bag, and appeared to be concealing the fact that he was traveling with a companion. 448 U.S. 438, 440 (1980); *see also United States v. Marrocco*, 578 F.3d 627, 633 (7th Cir. 2009); *see also Huff v. Reichert*, 744 F.3d 999, 1004-05 (7th Cir. 2014) (reasonable suspicion not established by suspect driving with out-of-state license plates on a particular highway where officer said much drug trafficking occurs);

*United States v. Sigmond–Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) ("[R]easonable suspicion may not be based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped.").

Nor does reasonable suspicion exist simply because a person has a criminal record, *United States v. Walden*, 146 F.3d 487, 490 (7th Cir. 1998), or reacts unhappily to government questioning, *United States v. Williams*, 731 F.3d 678, 687 (7th Cir. 2013) ("Most people, when confronted by a police officer, are likely to act nervous, avoid eye contact, and even potentially shift their bodies as if to move away from the area, thus making such behaviors of very little import to a reasonable suspicion determination.") Wanting to get through customs and get on with your day cannot be the basis for reasonable suspicion no matter how unpleasantly or awkwardly expressed. *Id.*; *Swenie v. Village of Maywood*, No. 17-CV-1010, 2018 WL 4635645, at *4 (N.D. Ill. Sept. 27, 2018).

Here, the district court's finding of reasonable suspicion was impermissibly grounded in Mr. Mendez's profile and past[1] rather than information showing that Mr. Mendez was actively engaged in a border crime. Unlike *Wanjiku* and *Skaggs*, here there was no evidence indicating what Mr. Mendez was doing outside of the country. There were no social media posts, contraceptives, associations with children, or other evidence regarding Mr. Mendez's activities. That Mr. Mendez travelled out of the

---

[1] The information available to Agent Callison showed that Mr. Mendez had a previous state-court misdemeanor conviction for endangering the life of a child following an arrest for different child offenses, not two previous arrests and a conviction, as the district court found. [Dkt. 142].

country says nothing about what he did there or whether his phone contained contra-band. All the government knew was that he was visiting his fiancée. This missing link between the Mr. Mendez's activities and actions and potential criminal behavior, in contrast to *Wanjiku* and *Skaggs*, makes it impossible for the government to estab-lish reasonable suspicion that Mendez was committing a border crime here. Indeed, Callison admitted there was no information that Mr. Mendez was actively involved in a crime at the time of the search. In response to the district court's finding of rea-sonable suspicion, therefore, Mr. Mendez may rightly ask what he was reasonably suspected of. *Kim*, 103 F. Supp. 3d at 44 ("But what is it that the officer must reason-ably suspect?...the Court is troubled by the lack of particularized grounds to believe that this defendant was engaged in criminal activity at the time he was exiting the United States.").

Speculation about what Mr. Mendez might have been doing in Ecuador, or what happened to him two years prior in Mexico, simply does not amount to reason-able suspicion that he was actively involved in a border crime at the time of the search. *Reid*, 448 U.S. at 440; *Terry,* 392 U.S. at 27; *Jerez*, 108 F.3d at 693; *see also Williams*, 731 F.3d at 687 (*Terry* requires reasonable, individualized suspicion even in high crime areas). Contrary to the district court's rationale, the government does not have the right to take a swing at searching a person convicted of a crime and see what turns up. *Walden*, 146 F.3d at 490. This is so even when hindsight makes the constitutional abridgement more palatable. *Martinez-Fuerte,* 428 U.S., at 565. That Mr. Mendez did not enjoy being questioned by government agents hardly supplies the

additional information necessary to justify a search of his cell phone. *Williams*, 731 F.3d at 687. With no more than a hunch that Mr. Mendez may have been involved in a crime at some point in time, the government lacked reasonable suspicion for the search of Mr. Mendez's cell phone and the fruits of its search should be suppressed for this additional reason.

## CONCLUSION

For the foregoing reasons, Mr. Mendez respectfully requests that the Court reverse the district court's order denying his Motion to Suppress.

DATE:  May 20, 2023                                       Respectfully Submitted,

                                                          MARCOS MENDEZ

                                                          By:  /s/ Marko Duric

                                                          Marko Duric
                                                          Robert Robertson
                                                          ROBERTSON DURIC
                                                          One North LaSalle, Suite 300
                                                          Chicago, Illinois 60602
                                                          (312) 223-8600
                                                          marko@robertsonduric.com
                                                          robrobertson1@sbcglobal.net

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant-Appellant Marcos Mendez, furnishes the following in compliance with Fed. R. App. P. 32(g) and Cir. R. 32:

I certify that this brief conforms to the rules contained in Fed. R. App. P. 32(a)(7) and Cir. R. 32 for a brief produced with a proportionally-spaced font. This brief contains 12,134 words as recorded by the word count of the Microsoft Office word-processing system used to prepare this brief, counting from the words "Jurisdictional Statement" through "Respectfully Submitted."

/s/s/ Marko Duric
*Attorney for Defendant-Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 20, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ Marko Duric</u>
*Attorney for Defendant-Appellant*

## **CIRCUIT RULE 30(D) STATEMENT**

The undersigned certifies that the materials required by parts (a) and (b) of Circuit Rule 30 are included in this appendix.


/s/ Marko Duric
*Attorney for Defendant-Appellant*

No. 23-1460

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MARCOS MENDEZ,

*Defendant-Appellant.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

NO. 16 CR 163

THE HONORABLE MARY M. ROWLAND PRESIDING

---

**APPENDIX PURSUANT TO RULE 30**

---

Robert Robertson
Marko Duric
ROBERTSON DURIC
One North LaSalle, Suite 300
Chicago, Illinois 60602
(312) 223-8600
*Attorneys for Defendant-Appellant*

## TABLE OF CONTENTS OF APPENDIX

March 8, 2023 Judgment in a Criminal Case………………………………..…A001-11

The District Court's July 28, 2021 Opinion……………………………………….A012-24

# UNITED STATES DISTRICT COURT
### Northern District of Illinois

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) | |
| | ) | |
| MARCOS MENDEZ | ) | Case Number:     1:16-CR-00163(1) |
| | ) | |
| | ) | USM Number:     54840-424 |
| | ) | |
| | ) | |
| | ) | Marco Andrew Duric |
| | ) | Defendant's Attorney |

**THE DEFENDANT:**

☒ pleaded guilty to Count Two (2) of the Indictment.

☐ pleaded nolo contendere to count(s)          which was accepted by the court.

☐ was found guilty on count(s)          after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section / Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|
| 18 U.S.C. § 2251(a), 18 U.S.C. § 2251(e) Production of Child Pornography | 12/15/2015 | 2 |

The defendant is sentenced as provided in pages 2 through 8 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ Counts 1, 3, and 4 of the Indictment dismissed on the motion of the United States

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

February 24, 2023
Date of Imposition of Judgment

*Mary M Rowland*
Signature of Judge

Mary M. Rowland, United States District Judge
Name and Title of Judge

March 8, 2023
Date

**A001**

Case: 1:16-cr-00163 Document #: 130 Filed: 03/08/23 Page 2 of 11 PageID #:1044
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 2 – Imprisonment          Case: 23-1460          Document: 10          Filed: 05/22/2023          Pages: 81          Judgment – Page 2 of 8

DEFENDANT: MARCOS MENDEZ
CASE NUMBER: 1:16-CR-00163(1)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
300 months as to count 2

☒          The court makes the following recommendations to the Bureau of Prisons: The Court recommends designation to SOMP and/or

FMC Devens. The Court further recommends Defendant participate in sex offender treatment.


☒          The defendant is remanded to the custody of the United States Marshal.

☐          The defendant shall surrender to the United States Marshal for this district:

☐          at          on

☐          as notified by the United States Marshal.

☐          The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐          before 2:00 pm on

☐          as notified by the United States Marshal.

☐          as notified by the Probation or Pretrial Services Office.


## RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at_____, with a certified copy of this
judgment.


_____
UNITED STATES MARSHAL


By _____
DEPUTY UNITED STATES MARSHAL


**A002**

DEFENDANT:  MARCOS MENDEZ
CASE NUMBER:  1:16-CR-00163(1)

## MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

Upon release from imprisonment, you shall be on supervised release for a term of:
Ten (10) years.

> The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☒ (1)  you shall not commit another Federal, State, or local crime.

☒ (2)  you shall not unlawfully possess a controlled substance.

☐ (3)  you shall attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, if an approved program is readily available within a 50-mile radius of your legal residence.  [Use for a first conviction of a domestic violence crime, as defined in **§ 3561(b)**.]

☒ (4)  you shall register and comply with all requirements of the Sex Offender Registration and Notification Act (**42 U.S.C. § 16913**).

☒ (5)  you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.

☒ (6)  you shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release.  [This mandatory condition may be ameliorated or suspended by the court for any defendant if reliable sentencing information indicates a low risk of future substance abuse by the defendant.]

## DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in **§ 3553(a)(1)** and **(a)(2)(B), (C), and (D);** such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in **§ 3553 (a)(2) (B), (C), and (D);** and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a**.
The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☐ (1)  you shall provide financial support to any dependents if you are financially able to do so.

☐ (2)  you shall make restitution to a victim of the offense under **§ 3556** (but not subject to the limitation of **§ 3663(a)** or **§ 3663A(c)(1)(A)**).

☐ (3)  you shall give to the victims of the offense notice pursuant to the provisions of **§ 3555**, as follows:

☒ (4)  you shall seek, and work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.

☐ (5)  you shall refrain from engaging in the following occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in the following specified occupation, business, or profession only to a stated degree or under stated circumstances; (if checked yes, please indicate restriction(s))

☒ (6)  you shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not:
> ☐ visit the following type of places:
> ☒ knowingly meet or communicate with the following persons: Minor A and her family.

☒ (7)  you shall refrain from ☒ any or ☐ excessive use of alcohol (defined as ☐ having a blood alcohol concentration greater than 0.08; or ☐            ), and from any use of a narcotic drug or other controlled substance, as defined in **§ 102** of the Controlled Substances Act (**21 U.S.C. § 802**), without a prescription by a licensed medical practitioner.

☒ (8)  you shall not possess a firearm, destructive device, or other dangerous weapon.

☐ (9)  ☐ you shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year.
> ☐ you shall participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider.
> ☐ you shall participate, at the direction of a probation officer, in medical care; (if checked yes, please specify:

**A003**

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

DEFENDANT:  MARCOS MENDEZ
CASE NUMBER:  1:16-CR-00163(1)

.)

☐ (10) (intermittent confinement): you shall remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling _____ [no more than the lesser of one year or the term of imprisonment authorized for the offense], during the first year of the term of supervised release (provided, however, that a condition set forth in **§3563(b)(10)** shall be imposed only for a violation of a condition of supervised release in accordance with **§ 3583(e)(2)** and only when facilities are available) for the following period _____.

☐ (11) (community confinement): you shall reside at, or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons) for all or part of the term of supervised release, for a period of _____ months.

☐ (12) you shall work in community service for _____ hours as directed by a probation officer.

☐ (13) you shall reside in the following place or area: _____, or refrain from residing in a specified place or area: _____.

☒ (14) you shall not knowingly leave from the federal judicial district where you are being supervised, unless granted permission to leave by the court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

☒ (15) you shall report to the probation office in the federal judicial district to which you are released within 72 hours of your release from imprisonment. You shall thereafter report to a probation officer at reasonable times as directed by the court or a probation officer.

☒ (16) ☒ you shall permit a probation officer to visit you ☒ at any reasonable time or ☐ as specified: ,
  ☒ at home    ☒ at work    ☒ at school    ☒ at a community service location
  ☒ other reasonable location specified by a probation officer
  ☒ you shall permit confiscation of any contraband observed in plain view of the probation officer.

☒ (17) you shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. You shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

☒ (18) you shall notify a probation officer within 72 hours if after being arrested, charged with a crime, or questioned by a law enforcement officer.

☐ (19) (home confinement)
  ☐ (a)(i) (home incarceration) for a period of __ months, you are restricted to your residence at all times except for medical necessities and court appearances or other activities specifically approved by the court.
  ☐ (a)(ii) (home detention) for a period of __ months, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the probation officer.
  ☐ (a)(iii) (curfew) for a period of __ months, you are restricted to your residence every day.
  ☐ from the times directed by the probation officer; or ☐ from __ to __.
  ☐ (b) your compliance with this condition, as well as other court-imposed conditions of supervision, shall be monitored by a form of location monitoring technology selected at the discretion of the probation officer, and you shall abide by all technology requirements.
  ☐ (c) you shall pay all or part of the cost of the location monitoring, at the daily contractual rate, if you are financially able to do so.

☐ (20) you shall comply with the terms of any court order or order of an administrative process pursuant to the law of a State, the District of Columbia, or any other possession or territory of the United States, requiring payments by you for the support and maintenance of a child or of a child and the parent with whom the child is living.

☐ (21) (deportation): you shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate authority in accordance with the laws under the Immigration and Nationality Act and the established implementing regulations. If ordered deported, you shall not remain in or enter the United States without obtaining, in advance, the express written consent of the United States Attorney General or the United States Secretary of the Department of Homeland Security.

☒ (22) you shall satisfy such other special conditions as ordered below.

☒ (23) You shall submit your person, property, house, residence, vehicle, papers [computers (as defined in 18 U.S.C. 1030(e)(1)), other electronic communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer(s). Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer(s) may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

A004

DEFENDANT: MARCOS MENDEZ
CASE NUMBER: 1:16-CR-00163(1)

☐    (24)    Other:

## SPECIAL CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C. 3563(b)(22) and 3583(d)

The court imposes those conditions identified by checkmarks below:

**During the term of supervised release:**

☐    (1)    if you have not obtained a high school diploma or equivalent, you shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

☐    (2)    you shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

☐    (3)    you shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least _____ hours of community service per week at the direction of the probation office until gainfully employed. The total amount of community service required over your term of service shall not exceed _____ hours.

☐    (4)    you shall not maintain employment where you have access to other individual's personal information, including, but not limited to, Social Security numbers and credit card numbers (or money) unless approved by a probation officer.

☒    (5)    you shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

☒    (6)    you shall provide a probation officer with access to any requested financial information requested by the probation officer to monitor compliance with conditions of supervised release.

☒    (7)    within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

☒    (8)    you shall file accurate income tax returns and pay all taxes, interest, and penalties as required by law.

☒    (9)    you shall participate in a sex offender treatment program. The specific program and provider will be determined by a probation officer. You shall comply with all recommended treatment which may include psychological and physiological testing. You shall maintain use of all prescribed medications.

☒        You shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. You shall consent to the installation of computer monitoring software on all identified computers to which you have access and to which the probation officer has legitimate access by right or consent. The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

☒        The cost of the monitoring shall be paid by you at the monthly contractual rate, if you are financially able, subject to satisfaction of other financial obligations imposed by this judgment.

☒        You shall not possess or use at any location (including your place of employment), any computer, external storage device, or any device with access to the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system

☒        You shall not possess any device that could be used for covert photography without the prior approval of a probation officer.

☒        You shall not view or possess child pornography. If the treatment provider determines that exposure to other sexually stimulating material may be detrimental to the treatment process, or that additional conditions are likely to assist the treatment process, such proposed conditions shall be promptly presented to the court, for a determination, pursuant to **18 U.S.C. § 3583(e)(2),** regarding whether to enlarge or otherwise modify the conditions of supervision to include conditions consistent with the recommendations of the treatment provider.

☒        You shall not, without the approval of a probation officer and treatment provider, engage in activities that will put you in unsupervised private contact with any person under the age of 18, and you shall not knowingly visit locations where persons under the age of 18 regularly congregate, including parks, schools, school bus stops, playgrounds, and childcare facilities. This condition does not apply to contact in the course of normal commercial business or unintentional incidental contact

☐        This condition does not apply to your family members:        [Names]

**A005**

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

DEFENDANT:  MARCOS MENDEZ
CASE NUMBER:  1:16-CR-00163(1)

         ☒     Your employment shall be restricted to the judicial district and division where you reside or are supervised, unless approval is granted by a probation officer.  Prior to accepting any form of employment, you shall seek the approval of a probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community you will pose if employed in a particular capacity.  You shall not participate in any volunteer activity that may cause you to come into direct contact with children except under circumstances approved in advance by a probation officer and treatment provider.

         ☒     You shall provide the probation officer with copies of your telephone bills, all credit card statements/receipts, and any other financial information requested.

         ☒     You shall comply with all state and local laws pertaining to convicted sex offenders, including such laws that impose restrictions beyond those set forth in this order.

☒    (10)    you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

☒    (11)    you shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the prior permission of the court.

☐    (12)    you shall pay to the Clerk of the Court $_____ as repayment to the United States of government funds you received during the investigation of this offense. (The Clerk of the Court shall remit the funds to _____ (list both Agency and Address.)

☐    (13)    if the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

☐    (14)    You shall observe one Reentry Court session, as instructed by your probation officer.

☐    (15)    Other: _____

**A006**

Case: 1:16-cr-00163 Document #: 130 Filed: 03/08/23 Page 7 of 11 PageID #:1049
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties
Case: 23-1460     Document: 10     Filed: 05/22/2023     Pages: 81     Judgment – Page 7 of 8

DEFENDANT:  MARCOS MENDEZ
CASE NUMBER:  1:16-CR-00163(1)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $100.00 | $31,629.00 | $.00 | $.00 | $5,000 |

☐    The determination of restitution is deferred until     . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☒    The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

Restitution of $31,629.00 to:

A BOLIN

☐    Restitution amount ordered pursuant to plea agreement $

☐    The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant **to 18 U.S.C. § 3612(f)**.  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g)**.

☒    The court determined that the defendant does not have the ability to pay interest and it is ordered that:

     ☒      the interest requirement is waived for the $31,629.00

     ☐      the interest requirement for the     is modified as follows:

☐    The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**A007**

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments                                                                          Judgment – Page 8 of 8

DEFENDANT:  MARCOS MENDEZ
CASE NUMBER:  1:16-CR-00163(1)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☒   Lump sum payment of $36,729 due immediately.

      ☐   balance due not later than           , or

      ☒   balance due in accordance with ☐ C, ☐ D, ☐ E, or ☒ F below; or

**B** ☐   Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐   Payment in equal         (e.g. weekly, monthly, quarterly) installments of $        over a period of         (e.g., months or years), to commence         (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐   Payment in equal         (e.g. weekly, monthly, quarterly) installments of $        over a period of         (e.g., months or years), to commence         (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐   Payment during the term of supervised release will commence within         (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☒   Special instructions regarding the payment of criminal monetary penalties:

You shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

**RESTITUTION SHALL BE MADE IN NOMINAL AND PERIODIC PAYMENTS, BY ORDER OF THE COURT.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee, if<br>Appropriate |
|---|---|---|---|

**See above for Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.**

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☒   The defendant shall forfeit the defendant's interest in the following property to the United States: See attached Preliminary Order of Forfeiture

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**A008**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 16 CR 163 |
| v. | ) | |
| | ) | Judge Mary M. Rowland |
| MARCOS GERMAN MENDEZ | ) | |

## PRELIMINARY ORDER OF FORFEITURE

The United States asks this Court to issue a preliminary order of forfeiture pursuant to Title 18, United States Code, Section 2253 and Federal Rules of Criminal Procedure 32.2.

(a)     On April 26, 2016, an indictment was returned charging defendant MARCOS GERMAN MENDEZ in Counts One and Two with producing child pornography, in violation of 18 U.S.C. § 2251(a); in Count Three with transporting child pornography, in violation of 18 U.S.C. § 2252A(a)(1); and in Count Four with possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). The indictment sought forfeiture to the United States of property that was used, or intended to be used, to commit and to promote the commission of the charged offenses.

(b)     On March 9, 2022, defendant MARCOS GERMAN MENDEZ entered a voluntary plea of guilty to Counts Two of the indictment. Pursuant to the terms of the plea agreement and as a result of his violation of 18 U.S.C. §§ 2251(a), defendant MARCOS GERMAN MENDEZ agreed that certain property, including but not limited to: an Apple iPhone 6S, Model Number, MKRY2LL/A, bearing serial number

FK3QD505GRY9, is subject to forfeiture pursuant to the provisions of 18 U.S.C. § 2253.

(c)     Defendant MARCOS GERMAN MENDEZ has agreed to the entry of a preliminary order of forfeiture relinquishing any right, title, or interest he has in the foregoing property pursuant to 18 U.S.C. § 2253, for disposition according to law.

(d)     The United States requests that this Court enter a preliminary order of forfeiture against defendant MARCOS GERMAN MENDEZ as to the foregoing property because the property was used, or intended to be used, to commit and to promote the commission of the offenses of conviction.

(e)     Accordingly, this Court orders that a preliminary order of forfeiture be entered against defendant MARCOS GERMAN MENDEZ as to an Apple iPhone 6S, Model Number, MKRY2LL/A, bearing serial number FK3QD505GRY9. Pursuant to 18 U.S.C. § 2253 and Fed. R. Crim. P. 32.2, all right, title, and interest of the defendant in the foregoing property named in this order shall be forfeited to the United States for disposition according to law.

(f)     Pursuant to 18 U.S.C. § 2253 and Fed. R. Crim. P. 32.2, the terms and conditions of this preliminary order of forfeiture shall be made part of the sentence imposed against the defendant and recited in any judgment and commitment order entered in the case.   In accordance with Rule 32.2(b)(4)(A), at sentencing-or at any time before sentencing if the defendant consents- the preliminary order of forfeiture, will become final as to the defendant.   Pursuant to Rule 32.2(c), if a third party files

a petition asserting an interest in the property to be forfeited, this Court must hold a hearing to determine his rights. Pursuant to 21 U.S.C. § 853(n)(2), incorporated by 18 U.S.C. § 2253(b), third parties have 30 days from the publication of notice or receipt of notice, whichever is earlier, to file a petition. The preliminary order of forfeiture will remain preliminary as to third parties until such an ancillary proceeding, if required, can be conducted under Rule 32.2(c). After disposition of all third party interests, this Court shall, upon the government's motion if appropriate, enter a final order of forfeiture for the property that is the subject of this preliminary order of forfeiture, thereby vesting clear title in the United States of America.

(g)    Pursuant to 21 U.S.C. § 853(g), as incorporated by 18 U.S.C. § 2253(b), and Fed. R. Crim. P. 32.2, upon entry of this preliminary order of forfeiture the foregoing property shall be seized by the United States Customs and Border Protection.

(h)    This Court shall retain jurisdiction to take such additional action and enter such further orders as may be necessary to implement and enforce this preliminary forfeiture order.

_____
MARY M. ROWLAND
United States District Judge

DATED:    November 29, 2022

3

**A011**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

MARCOS MENDEZ,

Defendant.

Case No. 16-cr-00163-1

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

On April 26, 2016, Defendant Marcos Mendez was indicted on four counts, two counts of production of child pornography, in violation of 18 U.S.C. § 2251(a); one count of transportation of child pornography, in violation of § 2252A(a)(1); and one count of possession of child pornography, in violation of §2252A(a)(5). Mendez has moved to suppress the evidence obtained by the Government in this case, arguing that the Government violated his Fourth Amendment rights by searching his cell phone without first obtaining a search warrant. For the following reasons, Mendez's motion to suppress [50] is denied.

### I. Background

The facts herein are undisputed and drawn from the evidentiary hearing and the parties' briefs. On February 20, 2016, Marcos Mendez ("Mendez" or "Defendant") arrived alone at Chicago O'Hare International Airport from Ecuador via Panama

City, Panama. (Gov't Resp. (Dkt. 54), p. 2). Based on a TECS entry[1] for Mendez, he was selected for secondary inspection. *Id*. During the secondary inspection, two U.S. Customs and Border Protection (CBP) Officers conducted routine questioning of Mendez. *Id*. Officers then searched Mendez's possessions and located three electronic devices—a personal cell phone, a work cell phone, and a work iPad. *Id*. at 3. The officers first manually searched Mendez's personal cell phone, his work cell phone, and his work iPad. *Id*. CBP Officer Richard Callison conducted a manual search of Mendez's personal cell phone. *Id*. at 4. Having found child pornography within about 30 minutes of when the secondary inspection began, Officer Callison consulted his supervisor and obtained approval to DOMEX Mendez's devices. *Id*. at 5. DOMEX technology downloads a copy of the device's contents based on certain search parameters but does not damage or change the data on the device or disrupt the function of the device. *Id*. The DOMEX extracted files only from the camera roll of Mendez's cell phone.

CBP gave the extracted data from the cell phone to DHS's Homeland Security Investigations ("HSI") (when CBP finds child pornography it calls on HSI to do the investigation). Relying in part on evidence from the manual search and forensic preview of Mendez's phone, the Government later obtained search warrants for Mendez's residence, his parents' residence, his Apple iCloud account, and his work electronics. (Dkt. 54 at 7). Border crossing information showed that on February 23,

---

[1] Formerly known as the Treasury Enforcement Communications System, TECS is used by the U.S. Department of Homeland Security (DHS) to manage the flow of people through border ports of entry and for immigration enforcement case management. *Id*.

2

2016, two days after Mendez was released from O'Hare, his mother drove him across the border into Mexico in the family's car. *Id*. at 8. Mendez was indicted on April 26, 2016 and was extradited to the United States from Mexico on January 22, 2020. *Id*.

The Court held an evidentiary hearing on the motion to suppress on May 28, 2021. (*see* Dkt. 73).[2] At the hearing, the Government presented testimony from CBP Officer Callison, who was assigned to the Customs' Passenger Enforcement Rover Team at O'Hare. Defendant presented testimony from HSI Special Agent Jennifer Finerty. In 2016 Agent Finerty was assigned to the HSI O'Hare Group. She obtained an initial search warrant on March 10, 2016 to search Mendez's and his parents' residence. She obtained a second search warrant for Mendez's three devices on March 18, 2016, and a third warrant on March 24, 2016 for all information related to Mendez's Apple ID. Defendant also presented CBP Officer Mohammed M. Alikhan, who was on the same team as Officer Callison in 2016. The Government also relied on six exhibits at the hearing.[3] The Court found all of the witnesses to be credible, in particular Officer Callison who provided the most testimony.

---

[2] Defendant requested an evidentiary hearing. (*see* Dkts. 59, 67). After review of the parties' briefs and consideration of the issues in dispute, the Court granted Defendant's request for an evidentiary hearing. *See United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004) (evidentiary hearing warranted if there are disputed issues of material fact).

[3] The Court admitted five of the Government's exhibits: Government Exhibits 1A through 1D: photos of how the secondary inspection area appeared on February 20, 2016 (although they were not photos of the exact area since that particular area is being remodeled). Government Exhibit 2: Mendez's personal iPhone. Government Exhibit 3: Customs and Border Protection tear-sheet explaining the airport search process. Government Exhibits 4A through D: red folder containing photographs of images Officer Callison saw during his manual search, in the cell phone's photo gallery. Government Exhibits 5A through D: CDs containing the photos and videos extracted from the cell phone using the DOMEX technology. Defendant stipulated to Government Exhibit 6, the NCIC (National Crime Information Center) report for Mr. Mendez.

3

Having considered the evidence and the parties' arguments presented in their briefs and at the hearing, the Court denies the motion to suppress.

## II. Analysis

### A. The Fourth Amendment and the Border Search Exception

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects[ ] against unreasonable searches and seizures." U.S. Const. amend. IV. *See Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Court must suppress evidence gathered in violation of the Fourth Amendment's protection against unreasonable searches and seizures. *See Mapp v. Ohio*, 367 U.S. 643, 648–49 (1961). The Fourth Amendment generally requires that a warrant supported by probable cause be issued before any search, with a few exceptions. *Stanley v. Henson*, 337 F.3d 961, 963 (7th Cir. 2003).

One such exception is the border search exception. *United States v. Ramsey*, 431 U.S. 606, 621-22, 97 S. Ct. 1972, 1978, 52 L. Ed. 2d 617 (1977). "[S]earches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *Id.* at 616. "The Court has linked this longstanding, congressionally-granted, search-and-seizure authority to two main purposes: to allow the regulation of the collection of duties, and

4

'to prevent the introduction of contraband into this country.'" *United States v. Wanjiku*, 919 F.3d 472, 480 (7th Cir. 2019) (citation omitted).[4]

### B. *United States v. Wanjiku*

The parties dispute the applicability of the Seventh Circuit's decision in *Wanjiku*. As here, that case involved a challenge to a warrantless border search of electronic devices at O'Hare. The district court found no Fourth Amendment violation because "the information available to the government at the time it initiated the searches of Mr. Wanjiku's electronic devices was sufficient to trigger a reasonable suspicion that he was involved" in criminal activity. *United States v. Wanjiku*, 2017 WL 1304087, at *5 (N.D. Ill. Apr. 6, 2017). On appeal, the Seventh Circuit affirmed. 919 F.3d at 474.

In June 2015, CPB and HSI were conducting a criminal investigation at O'Hare targeting certain individuals returning from three countries known for sex tourism and sex trafficking, including the sex trafficking of children. *Id*. Wanjiku met the investigators' initial screening factors, and after some additional research the investigators decided that Wanjiku should be sent for secondary inspection. After the CBP Officer's manual search of Wanjiku's cell phone, CBP turned the phone over to the HSI forensics team that used forensic software to "preview" Wanjiku's hard drive and cell phone. The searches revealed child pornography. *Id*. at 477-78.

On appeal, Wanjiku conceded that no court had applied a standard higher than reasonable suspicion for even highly intrusive searches at the border but argued that

---

[4] "O'Hare Airport is an international gateway into the United States, and incoming passengers from international ports are subject to border searches because the airport is the functional equivalent of an international border." *United States v. Yang*, 286 F.3d 940, 944 (7th Cir. 2002).

**A016**

the Supreme Court's decisions in *Riley v. California,* 573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014) and *Carpenter v. United States,* 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018) altered the legal landscape for cell phone searches. The Seventh Circuit acknowledged these cases but found "neither case addresse[d] searches at the border where the government's interests are at their zenith." *Id.* at 484. The Seventh Circuit observed that "[n]o court required probable cause and a warrant for a border search of any property," and no circuit court, before or after *Riley*, had "required more than reasonable suspicion for a border search of cell phones or electronically-stored data." *Id.* at 485.

Therefore, "[g]iven the state of the law at the time of these searches … the agents [] possessed an objectively good faith belief that their conduct did not violate the Fourth Amendment because they had reasonable suspicion to conduct the searches." *Id.* at 485-86. Summarizing the evidence the agents had gathered, the Court also found that "the agents possessed reasonable suspicion to search Wanjiku's electronic devices, including his cell phone, portable hard drive, and laptop computer. At the time that they conducted these searches, they reasonably relied on Supreme Court precedent that required no suspicion for non-destructive border searches of property, and nothing more than reasonable suspicion for highly intrusive border searches of persons." *Id.* at 488-89.

## C. The Mendez Search Did Not Violate the Fourth Amendment

Although *Wanjiku* did not decide "what level of suspicion is required (if any) for searches of electronic devices at the border," no circuit court including the Seventh

6

**A017**

Circuit has "required more than reasonable suspicion for a border search of cell phones or electronically-stored data." *Wanjiku*, 919 F.3d at 485, 489.[5] In this case, there was no Fourth Amendment violation because the agents had reasonable suspicion to search Mendez's cell phone.

### a. *Defendant's Argument that a Warrant was Required is Unfounded*

Relying on *Riley* and *Carpenter*, Defendant first argues that the officers should have obtained a warrant before the initial search of Mendez's cell phone. (Dkt. 50 at 5-10). The Seventh Circuit rejected the same argument in *Wanjiku*. The Seventh Circuit explained that in *Riley* and *Carpenter* the Supreme Court granted "heightened protection to cell phone data, [but] neither case addresse[d] searches at the border where the government's interests are at their zenith." 919 F.3d at 484. As the Supreme Court explained in *United States v. Montoya de Hernandez*, "not only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." 473 U.S. 531, 539, 105 S. Ct. 3304, 3309, 87 L. Ed. 2d 381 (1985).

---

[5] In 2019, the Ninth Circuit held that "manual searches of cell phones at the border are reasonable without individualized suspicion, whereas the forensic examination of a cell phone requires a showing of reasonable suspicion." *Cano*, 934 F.3d at 1016, cert. denied, 2021 WL 2637990. This year, in a civil case, the First Circuit "join[ed] the Eleventh Circuit in holding that advanced searches of electronic devices at the border do not require a warrant or probable cause...[and] join[ed] the Ninth and Eleventh Circuits in holding that basic border searches of electronic devices are routine searches that may be performed without reasonable suspicion." *Alasaad v. Mayorkas*, 988 F.3d 8, 13 (1st Cir. 2021), cert. denied sub nom. *Merch. v. Mayorkas*, No. 20-1505, 2021 WL 2637881 (U.S. June 28, 2021).

7

While not disputing that one purpose of a border search is "to prevent the introduction of contraband into this country," *Montoya de Hernandez*, 473 U.S. at 537, Defendant argues that cell phone searches do not promote this interest. (Dkt. 50 at 10-11). Relying on *Riley*, Defendant contends "that not only are cell phone searches ineffective in preventing the entry of electronic contraband, they allow the government to arbitrarily invade the expectation of privacy in millions of pages of unrelated personal information in the process." (*Id*.). Defendant's reliance on *Riley* is misplaced. *Riley* stressed the uniqueness of cell phones and the nature of the data they store but *Riley* was about the "search incident to arrest" exception to the warrant requirement; it did not involve either the border search exception or contraband. Most significant for this case, the Seventh Circuit specifically stated in *Wanjiku*, which involved child pornography at the border, that *Riley* did not "address[] searches at the border where the government's interests are at their zenith." 919 F.3d at 484. The fact that even when the phone is searched and seized, the "illicit material may be stored on remote servers and continue to remain accessible inside the border" (Dkt. 50 at 10), does not decrease the government's interest at the border. To the contrary, the ready availability of this particular form of contraband increases the government's interest in detecting efforts to "import" it.

Moreover, Defendant does not dispute that child pornography is digital contraband. *See e.g. United States v. Cano*, 934 F.3d 1002, 1014 (9th Cir. 2019).[6]

---

[6] Defendant relies on *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019), cert. denied, 2021 WL 2637946 (U.S. June 28, 2021), but there the Court found no basis "in the record for agents to reasonably suspect that [defendant] possessed child pornography on his

Indeed Officer Callison testified that as a CBP officer he is responsible for preventing contraband from entering the country and once he saw what he believed was child pornography on Mendez's phone, he had an obligation to prevent it from entering the country. Defendant also does not address CBP's statutory authority to inspect baggage for contraband, a point raised by the Seventh Circuit in *Wanjiku* (919 F.3d at 480-81) and argued by the Government here (Dkt. 54 at 9).

        *b.  Reasonable Suspicion Supported the Search*

Having determined that the border exception applies and at most the agents needed reasonable suspicion to search Mendez's cell phone, the question is whether reasonable suspicion existed for the initial manual search of Mendez's cell phone and scrolling through the photo roll.[7]

To assess whether officers have reasonable suspicion of criminal activity:

> we look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. Reasonable suspicion requires more than an inchoate and unparticularized suspicion or hunch but considerably less than preponderance of the evidence. Ultimately, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

---

devices." *Id.* at 723. By contrast here, agents had reasonable suspicion that Mendez's cell phone contained evidence of child pornography.

[7] The remaining searches, (1) the search of additional files in the phone's iSafe application, (2) the forensic preview (DOMEX), and (3) the extraction of metadata from the files using an "ExifTool" were all conducted after Officer Callison discovered child pornography during his initial search of the cell phone. This gave the Government at least reasonable suspicion for these remaining searches. *See Wanjiku*, 919 F.3d at 485, n. 15 (forensic agent's search of the first device, hard drive, revealed child pornography so "[a]t that point, the agents possessed probable cause to search Wanjiku's cell phone.").

*United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) (cleaned up). The standard "takes into account 'the totality of the circumstances—the whole picture.'" *Navarette v. California*, 572 U.S. 393, 397, 134 S. Ct. 1683, 1687, 188 L. Ed. 2d 680 (2014) (citation omitted). "Because it is a 'less demanding' standard, 'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause.' The standard 'depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Kansas v. Glover*, 140 S. Ct. 1183, 1188, 206 L. Ed. 2d 412 (2020) (cleaned up). The Court "measure[s] whether reasonable suspicion existed at the moment of the search." *Wanjiku*, 919 F.3d at 487.[8]

At the evidentiary hearing, Officer Callison testified that on February 20, 2016, he received a "lookout" from CBP's intelligence group  for Mendez. The lookout was for child pornography. Callison explained that a lookout provides information about the individual, their passport, and any arrest or other background information. Callison knew that the information leading to the lookout for Mendez was a prior arrest record related to child pornography or endangering a child, a 2011 conviction for endangering the life or health of a child, and "odd" previous travel. Based on the lookout, Callison searched the records and learned that in 2014 Mendez had been in a secondary inspection on return from Mexico and had reported that he had been kidnapped and all his electronics were taken and he was ordered to leave Mexico.

---

[8] Because the Court finds reasonable suspicion existed in this case it need not decide whether the good faith exception to the exclusionary rule applies.

A021

Callison approached Mendez who acted in a very condescending way and tried to divert attention from the inspection. Callison asked for his cell phone and its password. Once Callison unlocked the phone, he began manually scrolling through the camera roll (only the camera roll) on the phone. He saw thousands of images of pornography generally and had no doubt that some of it was child pornography.

Thus at the time Callison searched Mendez's cell phone, the Government knew: (1) Mendez was an adult male traveling by himself; (2) Mendez had significant prior travel; (3) he was traveling from Ecuador, which Officer Callison understood to be a potential source country for child trafficking; (4) in 2014, Mendez underwent a secondary inspection, and the customs report from that inspection stated that Mendez had been kidnapped and all his electronics taken and he was told to leave Mexico; (5) Mendez had prior arrests for child pornography and soliciting a minor; (6) he had a 2011 conviction for endangering the life or health of a child; and (7) when Callison met Mendez, Mendez was very condescending and gave the impression that CBP should be letting him go, which Callison believed showed Mendez attempting to deflect attention away from his inspection.

Defendant argues that the only basis for searching his phone was his 2011 conviction. (Dkt. 50 at 13). That is not accurate. While there were some distinguishing facts in *Wanjiku* (agents had social media information about Wanjiku and found physical evidence in his bags and other items that called into question his story about the reason for his travel), the overall facts are strikingly similar. In *Wanjiku* and here, both individuals were adult males traveling by themselves from countries that

11

**A022**

agents understood to be either a sex tourism destination or potential source country for child trafficking. Both men had prior criminal histories involving a minor victim. Both were flagged by the government before they landed at O'Hare as meeting certain criteria warranting a secondary inspection. Wanjiku was one of twenty-three or twenty-four individuals selected. Mendez was the target of a "lookout" from CBP's intelligence group for child pornography.

Additional facts here, not present in *Wanjiku*, support a finding of reasonable suspicion. Mendez had *two* prior arrests, both involving child pornography and solicitation, and a prior conviction for endangering the life/health of a child. Wanjiku had one prior arrest which involved a minor victim, but no prior conviction. Further, Mendez had a previous interaction with customs and at the time reported that all his electronics disappeared.

Considering the "whole picture" (*Navarette*, 572 U.S. at 397), the Court finds the agent had reasonable suspicion to scroll through Mendez's cell phone. Mendez's arguments do not account for the totality of the circumstances. He is correct that reasonable suspicion of criminal activity cannot be based *solely* on an individual's prior criminal record. *United States v. Walden*, 146 F.3d 487, 490–91 (7th Cir. 1998). But "a criminal record in conjunction with other information can form the basis of a reasonable suspicion." *Id*. At the evidentiary hearing, defense counsel asked Officer Callison whether it was fair to say that "pretty much any country could be a source of child pornography," and Callison responded yes. Again this is only one factor, and moreover, "the law simply does not require law enforcement officials, including

12

Customs inspectors, to be right every time." *Kaniff v. United States*, 351 F.3d 780, 790 (7th Cir. 2003).

### III. Conclusion

For the stated reasons, Mendez's motion to suppress [50] is denied.

E N T E R:

Dated: July 28, 2021

_____
MARY M. ROWLAND
United States District Judge

13

**A024**